[No. C066229. Third Dist. Mar. 22, 2012.]

In re WILLIAM JON PUGH on Habeas Corpus.

## COUNSEL

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Julie L. Garland, Jennifer A. Neill, Julie A. Malone, Assistant Attorneys General, Pamela B. Hooley and Kasey E. Jones, Deputy Attorneys General, for Appellant S. M. Salinas as Warden of Deuel Vocational Institution.

Michael Satris, under appointment by the Court of Appeal, for Respondent William Jon Pugh.

## OPINION

**BLEASE, Acting P. J.**—Charged with first degree murder, William Jon Pugh was convicted of second degree murder and sentenced to 15 years to life plus two years. At the time of the murder in April 1986, Pugh was 18 years old. He spent the next 24 years in prison before being released at age 42 pending this appeal.[1]

The Board of Parole Hearings (the Board) granted parole in October 2009. Governor Arnold Schwarzenegger reversed the Board's decision the next month. Pugh filed a writ of habeas corpus in the trial court, which was granted. The warden of the Deuel Vocational Institution where Pugh was housed at the time of the Board hearing filed this appeal from the judgment of the trial court granting the writ.

We shall affirm the judgment of the trial court. Appellant argues Pugh's current dangerousness is evidenced by his lack of insight into the offense

---

[1] This court denied appellant's petition for writ of supersedeas and request for temporary stay of the trial court order vacating the Governor's decision on November 4, 2010. Pugh was released from custody the following month.

combined with the heinous nature of his crime. We find no evidence in the record that Pugh currently lacks insight into his offense. Furthermore, we find no evidence of any recent history of lack of insight. Appellant's claim that the lack of insight makes the heinous nature of the crime probative to Pugh's current dangerousness must, therefore, be rejected.

Because the nature of the offense is no longer an accurate indicator of current dangerousness, the trial court correctly granted Pugh's petition for writ of habeas corpus.

## FACTUAL AND PROCEDURAL BACKGROUND

When Pugh was 18 years old, he shot and killed Donald Fields. Fields was 30 years old when he was killed, and was the roommate of Pugh's best friend, Jeff Alton. Pugh stole $30 worth of coins from Fields, and Fields told Alton he did not want Pugh visiting the house again. On the evening of the murder, Pugh went to Fields's apartment to try to convince him that Pugh had not stolen the money, even though Pugh later admitted he had taken the coins.

The jury heard Pugh's version of events, which was that after he managed to convince the victim that he had not taken the coins, the victim started complimenting his looks, then questioned whether Pugh and Alton had a homosexual relationship. The victim continued on in this vein until he finally sat back in his chair, put his hand on his genitals and told Pugh to touch him and "give [him] some head." Pugh panicked and shot the victim as the victim sat in the chair.

The prosecution's theory of first degree murder was that Pugh went to the victim's apartment intending to talk him into believing that Pugh had not stolen the coins, and that if that did not work he intended to kill the victim. As previously indicated, the jury rejected the charge of first degree murder and instead convicted Pugh of second degree murder.

The Board granted parole in October 2009. In concluding that Pugh did not pose a current risk of danger to society, the Board found that he had no juvenile record, had a stable social history, obtained his high school diploma while incarcerated, had participated in a great number of self-help programs, had numerous laudatory "chronos" from prison staff, had developed several job skills, had realistic parole plans including a place to live and a job offer, had maintained positive family ties, had maintained positive institutional behavior, had shown signs of remorse, had accepted responsibility for his criminal behavior, and had been assessed as posing a low risk of violent behavior in his two most recent psychological exams.

In November 2009, the Governor reversed the Board's decision to grant parole. The Governor cited two reasons for his decision. First was the heinous nature of the crime. As evidence of this, the Governor noted that the victim was an acquaintance of Pugh's and that the dispute had been about $30 in pennies, which Pugh had stolen from the victim. The Governor stated that the victim had been particularly vulnerable because he was unarmed and was in his residence, which was a place of security for him.

The Governor's second reason for reversing parole was that Pugh had "failed to obtain insight into his violent behavior." The reason the Governor arrived at this conclusion was that Pugh had consistently maintained he shot the victim when he "freaked out" after the victim made sexual advances toward him, but that this version of events was inconsistent with the facts in the record. These "facts" were (1) the probation report, which asserted that Pugh planned to confront the victim and "duke it out"; (2) statements from the victim's family denying he had been gay; and (3) statements made by the deputy district attorney at Pugh's parole hearing, claiming that when the victim answered the door to his apartment, Pugh did not wait before shooting the victim at the entrance of the residence.

Pugh petitioned the trial court for a writ of habeas corpus. The trial court granted the writ, concluding that the Governor's decision was not supported by some evidence Pugh constituted a current threat to public safety. The trial court found that the Governor's concern regarding Pugh's insight was based on the Governor's view that Pugh's insistence he shot the victim in a panic after a perceived sexual advance was contrary to the evidence. The trial court concluded that Penal Code section 5011 prevented the Board, and by extension the Governor, from requiring an admission of guilt as a condition for parole, and that the Governor likewise could not require Pugh to admit to a particular manner of killing, especially when Pugh's version of the facts was not necessarily inconsistent with the evidence.[2]

The trial court also concluded there was no evidence to support the Governor's conclusion that Pugh did not accept full responsibility for the offense. The Governor relied on a 1987 mental health examination, ignoring the more recent psychological reports indicating Pugh showed insight and remorse.

---

[2] Further references to an undesignated section are to the Penal Code. Section 5011, subdivision (b) states: "The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed."

## DISCUSSION

## I

## No Evidence of Current Dangerousness

When making parole decisions, both the Governor and the Board must consider the factors regarding parole suitability set forth in section 3041 and Board regulations.[3] (*In re Lawrence* (2008) 44 Cal.4th 1181, 1203 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*).) We review the Governor's decision for "some evidence" demonstrating the prisoner remains a current threat to public safety. (*Id.* at p. 1191.)

Within this framework, the Governor's review of an inmate's suitability for parole is independent and de novo. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 660 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).) The Governor has the authority to resolve conflicts in the evidence and to decide the weight to be given the evidence. (*Id.* at p. 677.) "Accordingly, the Governor has discretion to be 'more stringent or cautious' in determining whether a defendant poses an unreasonable risk to public safety." (*In re Shaputis* (2008) 44 Cal.4th 1241, 1258 [82 Cal.Rptr.3d 213, 190 P.3d 573].)

Our review of the Governor's decision is "highly deferential" (*Lawrence, supra*, 44 Cal.4th at p. 1204.) "[T]he judicial branch is authorized to review the factual basis of a decision . . . denying parole in order to ensure that the decision comports with the requirements of due process of law, but . . . in conducting such a review, the court may inquire only whether some evidence in the record before the [Governor] supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Rosenkrantz, supra*, 29 Cal.4th at p. 658.) In other words, we do not weigh the evidence to

---

[3] The factors tending to show unsuitability for parole are that the prisoner (1) committed the offense in an especially heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (Cal. Code Regs., tit. 15, § 2402, subd. (c).)

The factors tending to show suitability for parole are that the prisoner (1) does not possess a violent juvenile record; (2) has a reasonably stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills; and (9) has engaged in institutional activities indicating an enhanced ability to function within the law upon release. (Cal. Code Regs., tit. 15, § 2402, subd. (d).)

determine suitability for parole, but look at the record to determine only whether a modicum of evidence supports the Governor's decision. (*Id.* at p. 677.)

Still, there must be a connection between the factual findings and the conclusion that the inmate is currently dangerous. (*In re Criscione* (2009) 180 Cal.App.4th 1446, 1458 [103 Cal.Rptr.3d 549].) "[T]he relevant inquiry is whether some evidence supports the *decision* of the . . . Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." (*Lawrence, supra*, 44 Cal.4th at p. 1212.)

Appellant argues that two factors cited by the Governor indicate the trial court's decision should be reversed: (1) the circumstances of the offense, and (2) Pugh's lack of insight into his violent behavior.

### A. *Circumstances of Offense*

■ As to the first factor, the Governor may base a denial of parole decision on the circumstances of the offense only if such circumstances "support the ultimate conclusion that [the] inmate *continues* to pose an unreasonable risk to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1221.) Where the inmate's record indicates he is no longer dangerous, the circumstances of the commitment offense do not provide "some evidence" of unsuitability for parole absent a "rational nexus between those facts and current dangerousness." (*Id.* at p. 1227.) Appellant claims Pugh's lack of insight indicates the heinous nature of the offense is still probative to his current dangerousness. Therefore, our review of the Governor's decision turns on whether there is evidence Pugh lacks insight into his criminal behavior.

### B. *Lack of Insight*

Appellant's opening brief asserts that Pugh's lack of insight is evidenced by his varied depictions of the crime, his continued denial of culpability, and his problematic psychological evaluations. We find no evidence to support any of these assertions. We also address an issue raised at oral argument following the Supreme Court's recent decision, *In re Shaputis* (2011) 53 Cal.4th 192 [134 Cal.Rptr.3d 86, 265 P.3d 253] (*Shaputis II*). Appellant argues there is some evidence that Pugh's version of the crime is different from the official version, and that this constitutes some evidence of current dangerousness. We shall conclude that any difference in Pugh's version of the crime provides no evidence of current dangerousness where his version is not inherently incredible and is not inconsistent with the evidence established in the case.

1. *Varied Depictions of the Crime.*

As evidence that Pugh's depictions of the crime have varied, appellant first asserts that Pugh initially stated he murdered the victim because he was angry at the victim over the victim's allegations that Pugh had stolen $30 in pennies. There is no evidence in the record that Pugh ever gave this reason for the shooting. The probation report related that Alton told police Pugh had taken offense that the victim accused him of theft. According to the probation report, *Alton* claimed that two or three days prior to the shooting, Pugh said he was going to confront the victim and "duke it out." However, the probation report did not state that Pugh himself gave this as a reason for the murder.

The probation report also stated that Pugh told Alton he had been sitting and talking to the victim, when he (Pugh) "freaked out." This is consistent with all of Pugh's later statements regarding his reason for the shooting, although it is incomplete. Pugh told a defense psychologist who began interviewing him a few months after the offense that the victim had made sexual advances toward him and that it was in that context that he pulled the gun and shot the victim. The psychologist stated that Pugh appeared to be "genuinely and severely homophobic."

This was the version of events to which Pugh testified at his trial. This was the version of events Pugh told the court-appointed psychiatrist, who interviewed him in the months following the crime. This was the version of events Pugh related to his mental health evaluator in 2007. This was the version of events Pugh related to his psychological evaluator in 2008. Appellant's claim that Pugh's depiction of the crime has "varied" is therefore unfounded.

Appellant also claims there is no evidence in the record to support Pugh's "self-serving" version of the crime. In fact, the evidence was more supportive of Pugh's version of the crime than of the prosecution's theory that Pugh went to the apartment intending to kill the victim and shot him shortly after entering the apartment. At Pugh's 2007 parole hearing, Deputy District Attorney Cintean stated: "[W]hen . . . the victim, opened the door . . . defendant didn't wait much before shooting the victim at the entrance of the victim's own residence. . . . [T]his crime was committed in a friction over pennies. It was, the motive for this was trivial. There's pretty much no motive for this other than being accused of stealing pennies. He overheard that he was being accused of stealing the pennies, and even though he had, he didn't want to admit it, and he wanted to pretty much teach the victim a lesson by bringing a gun and shooting the victim, execution-style that is, in front of, or at the door, at the victim's door inside the victim's residence."

Contrary to this statement, the evidence showed that Pugh telephoned his girlfriend and Alton from the phone at the victim's apartment approximately 30 minutes before the shooting, and Pugh's testimony indicated he had been at the apartment for approximately an hour and a half before the shooting. Also, a slug and blood was found in and on the living room chair, corroborating Pugh's account that he shot the victim while he was sitting in the chair, where the body was found, rather than just inside the entrance to the apartment.

### 2. Denial of Culpability

Appellant claims there is evidence in the record that Pugh has denied his culpability for the crime, and that his attitude regarding his involvement in the crime varies. To the extent Pugh's attitude regarding his involvement in the crime has varied, the record shows that his attitude has evolved in a positive manner that supports parole.

Appellant points to Pugh's original probation report, completed in 1988, in which it was reported that Pugh said he felt the jury made a mistake in convicting him, and that it should have taken his case more seriously. He said, "This is the first time in my life I was completely honest and the jury convicted me. It makes me mad." By 2008, when Pugh was asked about the fairness of his sentence, he stated: "I was guilty. I feel the trial went badly and I could have received a lesser sentence; but I accept it. I have come to terms with it."

In the 2008 parole hearing, Pugh further explained that "[b]ack then when this happened," he felt it was unfair that he went on the stand, told the truth for the first time in his life, and said things that made him look bad and weak, and other people were not completely honest. He said he had resented it, and "that's the way I thought."

He explained that, someone from the prosecution wrote a letter saying he should have been convicted of manslaughter rather than murder. He said that for a long time this made him feel that his conviction had been unfair. Now, however, he said: "As I've grown, gotten older and talked more and more about this, I've come to learn that, forget about all that. This was a murder, I did it, it's cut and dry, move on."

Pugh's 2008 psychological evaluation, far from stating that Pugh still had not accepted responsibility for the crime, stated that Pugh "took full responsibility for his crime," and "evidenced remorse and guilt for his actions and involvement in the instant offense." At the 2008 hearing, Pugh expressed that at the time of the offense he had not thought he was guilty, but now, "It was

murder, period." Contrary to appellant's argument, the record indicates Pugh no longer denies culpability for the crime.

Furthermore, there is evidence in the record that Pugh has accepted responsibility for the crime for some time. A 1991 psychological evaluation concluded he "shows ample insight" into the crime. A 2005 evaluation concluded he "takes full responsibility for this murder and does not try to excuse or trivialize his involvement."

■ Appellant also argues that Pugh's challenge of the evidence presented by the deputy district attorney who appeared at his parole consideration hearing shows that he has failed to accept responsibility for the crime. However, this court has held that an inmate's refusal to agree with the prosecution's version of the crime does not support a finding of lack of insight. (*In re Palermo* (2009) 171 Cal.App.4th 1096, 1110–1112 [90 Cal.Rptr.3d 101] (*Palermo*), disapproved on another point in *In re Prather* (2010) 50 Cal.4th 238, 252 [112 Cal.Rptr.3d 291, 234 P.3d 541].)

In *Palermo*, the Board denied parole based on its finding that the inmate lacked insight into his behavior because of his insistence that he believed the gun with which he shot and killed the victim was unloaded. (*Palermo, supra*, 171 Cal.App.4th at p. 1110.) The inmate argued it was inappropriate to find him unsuitable for parole because he refused to admit to second degree murder, rather manslaughter. (*Ibid.*) We reasoned that since the Board could not condition parole on an admission of guilt, it also could not base a finding of current dangerousness on the inmate's insistence that the killing took place in a manner that was not inconsistent with the evidence where the inmate otherwise had accepted full responsibility for the crime, expressed remorse, participated in rehabilitative programs, and been evaluated by psychologists as posing no risk of danger to the public if released on parole. (*Id.* at pp. 1110–1112; § 5011, subd. (b); Cal. Code Regs., tit. 15, § 2236.)

As in *Palermo, supra*, 171 Cal.App.4th 1096, Pugh's version of events is not inconsistent with the evidence, and Pugh has explained that although he was prompted to kill the victim by the victim's sexual advances toward him, he does not think the victim bears any responsibility for Pugh's crime. Also as in *Palermo*, Pugh has accepted full responsibility for the crime, has expressed remorse, has participated in rehabilitative programs, and has been evaluated as posing no risk of danger to the public if released. Accordingly, we find no evidence to support appellant's claim that Pugh has denied his culpability for the crime.

### C. *Psychological Evaluations*

Finally, appellant asserts that Pugh's comments made during his psychological evaluations show a lack of insight. Appellant argues that Pugh was

evaluated in 1987, but it was not until 2000 that a psychologist reported he had matured and improved his adjustment. Appellant provides no record cites for this assertion, and it is untrue.

The first evaluation that appears in the record following the 1987 evaluation for the purpose of assisting in Pugh's defense is from 1991. The 1991 evaluation concludes Pugh is "relatively mature and stable . . . with no obvious evidence of serious problems." The evaluator also concluded that "maturation has had a positive effect on [Pugh's] behavior, insight, judgment and perception." The evaluator reported that Pugh "shows ample insight, indicating that he would never again put himself in a position where he was carrying a gun, and is no longer bothered by homosexuals."

A 1994 report was quoted at Pugh's 2008 parole hearing as stating: "He's matured along with gaining insight. He avoids conflicual [sic] situations, doesn't get caught up in the pettiness that goes on around him, and [the] predisposing factors that contributed to the commitment offense, the immaturity, inability to express himself emotionally, inadequate means of expressing anger, are no longer applicable, as this inmate has matured considerably and has gained insight."

In 2000, as appellant concedes, the psychological report stated that Pugh had "significantly matured and improved his adjustment in the years he's been incarcerated." In the same report, it was noted that Pugh recognized his "impulsive and out of control lifestyle, and is horrified to think of the personal state he was in at that time." Pugh acknowledged that "there was no excuse for the crime" and "spoke with some feeling about the tragedy of this crime for the victim and the victim's family, as well as his own family." The report concluded that Pugh's level of dangerousness was low.

A 2008 psychological evaluation cited to several prior evaluations, notably one performed in 2005, which stated: "Mr. Pugh 'takes full responsibility for this murder and does not try to excuse or trivialize his involvement. He admits he has made numerous mistakes, not the least of which was having a gun. He states he used to blame the crime on his own insecurities and thus indirectly blamed the victim. He now admits it was an utterly senseless killing and he blames no one but himself. He has come to understand how many lives he has ruined in addition to his own, and expressed much ongoing remorse.' Dr. Girtman emphasized the progress and improved level of insight and maturation achieved by the inmate."

A 2006 psychological report stated that Pugh "shows genuine insight and remorse into his early behavior." A 2007 mental health evaluation reported that Pugh, "demonstrates remorse into the far-reaching consequences of his

crime, in the case of the victim, the victim's family, and his own." The evaluator stated that Pugh was "able to demonstrate insight into the causative factors that led up to this crime and ways to improve his overall functioning that would substantially lower the risk of future criminal behavior." His 2008 psychological report stated that he "evidenced remorse and guilt for his actions and involvement in the instant offense."

Contrary to appellant's assertion that Pugh's psychological evaluations show a lack of insight, the evaluations on record consistently indicate Pugh has demonstrated insight into the crime and exhibited remorse.

### D. *No Evidence That Pugh's Version of Events Was Untrue*

In his opening brief, appellant focused on Pugh's lack of insight as evidenced by (1) "his varied depictions of the crime," (2) "his continued denial of culpability," and (3) "his problematic psychological evaluations." In a single sentence unsupported by any citation to the record, appellant alluded to another reason set forth by the Governor: "There is no evidence in the record, besides Pugh's self-serving statements, to support the contention that the murder was the result of the victim's sexual advances."

As indicated, the Governor concluded Pugh's version of the offense was inconsistent with the facts in the record that (1) he went to Fields's apartment to "duke it out," (2) Fields was not gay, and (3) Pugh shot Fields shortly after Fields answered the door. At oral argument, appellant stressed this aspect of the Governor's reversal, and asserted that the Supreme Court's recent decision in *Shaputis II* "requires that the Superior Court's decision be reversed." We disagree.

*Shaputis II* reaffirmed "the deferential character of the 'some evidence' standard for reviewing parole suitability determinations." (*Shaputis II, supra,* 53 Cal.4th at p. 198.) The "some evidence" standard refers to evidence of current dangerousness. There must be " ' "some evidence" supporting the core statutory determination that a prisoner remains a current threat to public safety—not merely "some evidence" supporting the Board's or the Governor's characterization of facts contained in the record.' " (*Id.* at p. 209.) In this case, unlike *Shaputis II*, the evidence cited by the Governor may constitute some evidence to support the Governor's characterization of the facts, but it was not evidence from which a finding of current dangerousness could be inferred.

Shaputis was convicted of second degree murder in the shooting death of his wife. (*Shaputis II, supra,* 53 Cal.4th at pp. 200–201.) He claimed not to have known the gun was loaded, even though an open box of ammunition

was on the table. (*Id.* at p. 201.) He claimed to have shot his wife by accident, even though the gun could not be fired unless the hammer was manually cocked before the trigger was pulled, and a transfer bar prevented accidental discharge by making the gun impossible to fire unless the trigger was pulled and held back. (*Ibid.*)

Also, while Shaputis was responsible for calling 911, his wife's body was cold to the touch, blood had partially dried on her face, neck, and head, and there was postmortem lividity in the lower parts of her leg and arm, caused by pooling of the blood after death. (*Shaputis II, supra*, 53 Cal.4th at p. 201.) This, plus the fact that the 911 call was made some 58 minutes to an hour and 28 minutes after gunshots were heard, indicated Shaputis waited to call for help. (*Ibid.*) Shaputis had a long history of domestic violence, and had abused his four daughters. (*Id.* at p. 202.)

Shaputis's version of the crime changed over the years. At an early parole hearing he claimed he shot his wife by accident, that they did not fight before the shooting, that she handed him the gun for his own protection, that he did not know the gun was loaded, and that he had not aimed the gun at her. (*Shaputis II, supra*, 53 Cal.4th at pp. 202–203.) At a later hearing, he said his wife gave him the gun because there had been a prowler in the neighborhood, and she wanted him to look at the gun to see if she could use it. (*Id.* at p. 203.) When he took the gun out of its case, the shells that were in the box fell out. He pointed the gun at the fireplace and pulled the trigger. The gun went off, and he saw his wife on the floor, but he had not seen her before. He called 911 after he found the phone. (*Ibid.*)

The court stated that "an *implausible* denial of guilt may support a finding of current dangerousness . . . ." (*Shaputis II, supra*, 53 Cal.4th at p. 216.) It is not the denial of guilt itself that reflects a lack of insight, "but the fact that the denial is factually unsupported or otherwise lacking in credibility." (*Ibid.*) In Shaputis's case, his statements about the shooting "failed to account for the facts at the scene or to provide any rational explanation of the killing." (*Ibid.*)

Thus, it is not the denial of guilt itself (or, as here and in *Shaputis II*, a refusal to accept the official version of the crime) that reflects a lack of insight supporting a finding of current dangerousness. As Justice Liu's concurring opinion explained, *Shaputis II* does not hold that "some evidence of lack of insight into past criminal behavior necessarily means there is some evidence of current dangerousness." (*Shaputis II, supra*, 53 Cal.4th at p. 226 (conc. opn. of Liu, J.).) The majority acknowledged the possibility "that when a denial of guilt is the *only* evidence of an inmate's lack of insight, and the denial is plausible, parole may not be denied on that basis." (*Id.* at p. 216.)

Instead, where the inmate's version of events is contrary to the facts established at trial and is inherently improbable, this reflects on the inmate's credibility, and indicates a refusal to admit the truth to himself and to others. This establishes a nexus to current dangerousness because it indicates the inmate is hiding the truth and has not been rehabilitated sufficiently to be safe in society.

■ Unlike *Shaputis II*, Pugh's version of events was, as we shall show, neither implausible nor inconsistent with the evidence. Because this was the case, the facts cited by the Governor showing inconsistencies between Pugh's version and the official version of the crime do not allow an inference that Pugh is currently dangerous.

There is no inherent improbability in Pugh's version of the crime. The most obvious evidence of this is that the jury believed Pugh's story, convicting him of second degree murder rather than the charged offense of first degree murder. Additionally, Pugh has been consistent in his retelling of the events, and nothing in his story is so farfetched as to be unbelievable.

As to Pugh's version of events and the official version, the Governor pointed to three inconsistencies.[4]

First, the probation report stated Pugh said he was going to confront Fields and "duke it out." The actual trial testimony was given by Alton, who stated that Pugh said he was going to confront the victim, and that Alton understood this to mean he would verbally confront him. Pugh has admitted that he went to the victim's house and confronted him about his accusation that Pugh stole coins from him. Therefore, there is no inconsistency between Pugh's statement and the trial testimony.

Second, the Governor points to the letters from members of the victim's family, as well as their testimony at various parole suitability hearings in

---

[4] At oral argument, counsel for appellant brought up an additional claimed inconsistency not mentioned in the Governor's reversal—that the victim's pants were not unzipped when the body was found. The only evidence regarding this fact that we have been able to find in the record presented to us is in our earlier opinion affirming Pugh's underlying conviction. We have granted appellant's request that we take judicial notice of the opinion. Even so, the opinion does not provide evidence of any inconsistency. The only reference to the victim's pants being unzipped is a statement in the opinion that the victim "apparently *started* to unzip his pants." (Italics added.) There is no clear inconsistency. The opinion indicates that the victim started to unzip his pants, not that he did unzip them. Because of the imprecision of the English language, this reference could mean the victim made a motion as if to unzip his pants, or that he grabbed his zipper, but never unzipped his pants, or that he partially unzipped his pants. In any event, the Governor did not rely on this fact for his reversal, and it cannot be viewed as an inconsistency that would render Pugh's version of events implausible.

which they insisted the victim was not gay. Assuming Pugh is telling the truth, it was not necessary for the victim to have been gay for Pugh to have perceived the situation as one of homosexual aggression. A psychological evaluation of Pugh performed in 1987 determined that he was a "highly sensitive and suspicious individual who tends to misinterpret the motives and the behaviors of others and to do so in ways that are at times frankly paranoid," and that his "fear of homosexuals and homosexuality is both significant and significantly irrational." The victim's heterosexuality was thus not an inconsistency that would justify an inference that Pugh is not credible and has not gained insight.

Third, the Governor points to a statement by the deputy attorney general at one of Pugh's parole hearings that Pugh "didn't wait much before shooting the victim at the entrance of the victim's own residence." The deputy attorney general's statement is not borne out by the evidence produced at trial. There is no evidence in the record before us that the victim was shot shortly after Pugh went to the apartment. On the contrary, there is evidence he called two of his friends from the victim's telephone approximately an hour after he arrived.

The only evidence that Pugh shot the victim at the doorway to the apartment was the location of the body, and this was not inconsistent with Pugh's version of events. There was expert testimony that the victim could have moved 10 to 15 feet after being shot, and possibly 50 to 100 feet before collapsing. Other evidence precluded an inference Pugh shot the victim at the front door. This evidence surfaced part of the way into the trial, when the bailiff discovered one of the bullets and some blood in the victim's chair.

As demonstrated, the facts cited by the Governor did not constitute "some evidence" that Pugh is currently dangerous because the facts are either not inconsistent with Pugh's version of events or not borne out by the record. This means no inference can be drawn from these facts that Pugh is lying about what happened, and consequently no inference can be drawn that he is still dangerous.[5]

---

[5] At oral argument, appellant's counsel stressed that Pugh refused to talk about the circumstances of the commitment offense in his parole hearing. In *Shaputis II, supra*, 53 Cal.4th 192, this was an issue because Shaputis refused to give any testimony at his parole hearing and refused to be interviewed by the psychologist appointed by California's Department of Corrections and Rehabilitation. (*Id.* at p. 199.) Instead, he presented a written statement at the hearing prepared with the help of his counsel and hired his own psychologist, who submitted a report. (*Ibid.*) Because these differed from older reports and statements in the record, the Supreme Court held that if the Board relied on the earlier reports in the record, the courts could not choose to rely on the later reports instead. (*Id.* at p. 211.)

The court stated, "often the most recent evidence as to the inmate's level of insight will be particularly probative on the question of the inmate's present dangerousness, but that is not

Because there is no evidence in the record that Pugh lacks insight into the crime, this is not a factor that would indicate the nature of the offense is still probative to current dangerousness.

## II

### Remedy

The trial court ordered the Governor's decision reversed and vacated, and the Board decision reinstated. Appellant argues that if we affirm the trial court, the proper remedy is to remand to the Governor to proceed in accordance with due process. Appellant cites *In re Prather, supra*, 50 Cal.4th at pages 257–259, in which the Supreme Court held that when a court reverses a determination of unsuitability by the Board it is limited to ordering the Board to conduct a new parole suitability hearing in accordance with due process of law. However, *Prather* has no application to the Governor's reversal of the Board. *Prather* expressly acknowledged that its prior decisions "did not determine the proper remedy when a reviewing court grants a petition for writ of habeas corpus on the basis that the Board's decision to deny parole was not supported by some evidence of current dangerousness" because the prior decisions "addressed the Governor's reversal of a grant of parole by the Board." (*Id.* at p. 252.)

Instead, the Supreme Court has tacitly approved the remedy of reinstating the Board's decision when the Governor's reversal is not supported by some evidence of current dangerousness. In *Lawrence, supra*, 44 Cal.4th at page 1190, as here, the Governor reversed the Board's decision to grant parole. The Court of Appeal granted the inmate's habeas corpus petition and reinstated the Board's decision. The Supreme Court affirmed the judgment of the Court of Appeal. (*Id.* at p. 1229.) Thus, the disposition was to reinstate the Board's decision, and not to remand the case to the Governor.

---

*necessarily* the case. If the newest evidence is unreliable or insubstantial, the parole authority is not bound to accept it." (*Shaputis II, supra*, 53 Cal.4th at p. 211.) The court noted that if the inmate refuses to participate in the hearing, the parole board must base its decision on other information. Such other information is not limited to the information the inmate chooses to present, and the Board may weigh the credibility of such information against the other evidence in the record. (*Ibid.*)

In this case, Pugh did not refuse to participate in the hearing at all, but only declined to discuss the circumstances of the crime. He discussed the circumstances of the crime in his parole hearing the year before, in 2007, and the record contains psychological evaluations prepared for the Board in 2007 and 2008. There was no issue here of ignoring newer, inconsistent evidence because it was submitted by Pugh. To the extent appellant argues the inmate's decision to refrain from discussing the circumstances of the offense gives the Governor carte blanche to ignore later evidence and rely only on the earliest psychological evaluations and the inmate's earliest statements about the crime, we disagree.

Several Courts of Appeal, including this court in *In re Copley* (2011) 196 Cal.App.4th 427, 433–435 [126 Cal.Rptr.3d 265], have concluded that the proper remedy when vacating the governor's parole decision is to reinstate the Board's grant of parole and require the inmate to be paroled in accordance with the reinstated Board decision. (See *In re Ryner* (2011) 196 Cal.App.4th 533, 552–553 [126 Cal.Rptr.3d 380]; *In re Nguyen* (2011) 195 Cal.App.4th 1020, 1036 [125 Cal.Rptr.3d 751]; *In re McDonald* (2010) 189 Cal.App.4th 1008, 1023–1025 [118 Cal.Rptr.3d 145].) We agree with the reasoning of these cases, and we adhere to their approach. Accordingly, we conclude the proper remedy in this case is to reinstate the Board's 2009 decision and require Pugh be granted parole on terms and conditions consistent with the Board's 2009 decision.

## DISPOSITION

The judgment is affirmed.

Hull, J., and Murray, J., concurred.