Filed 6/20/13  In re Fowler CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re CHRIS FOWLER on Habeas Corpus. | C070959 |
| | (Super. Ct. No. 7841) |
| | ORDER MODIFYING OPINION |
| | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 18, 2013, be modified as follows:

1.      On page 14, the last full paragraph, the citation to *Coronel*, *supra*, 210 Cal.App.4th at pp. 1243-1244 is deleted and the following citation added in its place:

(*Lawrence*, *supra*, 44 Cal.4th at p. 1214.)

2.      On page 18, the first full paragraph, the citation to *Coronel*, *supra*, 210 Cal.App.4th at p. 1248 is deleted so that the string of citations at the end of the paragraph reads as follows:

1

(*Morganti*, *supra*, 204 Cal.App.4th at p. 923; *Lawrence*, *supra*, 44 Cal.4th at p. 1212.)

There is no change in the judgment.

BY THE COURT:


          RAYE          , P.J.


          NICHOLSON   , J.


          BUTZ          , J.

Filed 6/18/13 (unmodified version)

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| In re CHRIS FOWLER on Habeas Corpus. | C070959 |
| | (Super. Ct. No. 7841) |

Does insight into one's past actions require a complete understanding of those actions, or is remorse and regret over the results of those actions enough?  In this case we consider just such a conundrum.  In November 1983 22-year-old defendant Chris Fowler beat 22-month-old Aaron Miller to death.  Defendant was convicted of murder in the second degree and sentenced to 15 years to life with a minimum eligible parole date of December 23, 1993.  On November 8, 2010, the Board of Parole Hearings (Board) found defendant suitable for parole.  However, the Governor reversed the Board's decision, concluding that if released, defendant would pose an unreasonable risk to public safety.  Defendant filed a petition for writ of habeas corpus in the trial court, which the court denied.

Subsequently, defendant filed a petition for writ of habeas corpus in this court and we issued an order to show cause.  Defendant contends there is no evidence supporting

1

the Governor's stated reasons for reversing the grant of parole.  Cognizant of the rule that the Governor's decision need only be supported by a "modicum" of evidence, we nonetheless conclude the Governor's decision is not supported by evidence that defendant will pose an unreasonable risk of danger to society if released from prison.

## FACTUAL AND PROCEDURAL BACKGROUND

**The Crime**

Defendant and Tina Miller lived together with Miller's two children:  22-month-old Aaron and three-year-old Christy.  On October 30, 1983, following an evening of trick-or-treating, Miller and defendant had an argument and stayed up all night drinking and smoking marijuana.

The next morning, defendant visited friends and smoked more marijuana.  Miller, who had to go to work, left the children in the care of her cousin.  When Miller left she noted Aaron had a black eye she thought he had received while playing outside, and an injury to his upper head caused by an accident with a car door the previous evening.

In the afternoon defendant returned home and found Miller's cousin caring for the children.  The two men smoked more marijuana.  Miller's cousin left, and defendant put the children to bed for a nap and took a nap himself.

Christy woke defendant up about 45 minutes later.  Defendant, angry at being awakened, heard Aaron crying and went to his room.  Aaron sat on his bed crying, and defendant began to yell at him.  Defendant knocked Aaron off the bed with an open hand. Aaron fell to the floor.

Defendant picked up Aaron and shook him, telling him to be quiet.  Aaron continued to cry and defendant continued to shake him, dropping him on the floor twice. Aaron suddenly became quiet.  Defendant later told a detective that " 'he did not want to take care of the child in the first place and wanted to "just sleep," he was "so sleepy."  He said he could not believe he had struck the child.' "  Defendant also told the detective he dropped the baby by accident.

2

Defendant carried Aaron to the bathroom and placed him in the bathtub. Defendant felt out of control and was afraid of what he might do. He changed Aaron's diaper and took him into the living room. Defendant noticed Aaron's skin had turned blue.

Defendant attempted mouth-to-mouth resuscitation. He called Miller and told her about Aaron, suggesting the boy might be having an asthmatic seizure. Against defendant's wishes, Miller contacted her mother, a nurse who lived nearby.

Miller's mother arrived and found an hysterical Christy and defendant attempting mouth-to-mouth resuscitation on Aaron. Miller's mother took over and began cardiopulmonary resuscitation (CPR). Defendant and Miller's mother argued about taking Aaron to the hospital; defendant did not want Miller's mother to accompany them. Ultimately, both took Aaron; defendant drove while Miller's mother administered CPR.

Because of the severity of his injuries, Aaron was transferred to the UC Davis Medical Center. Aaron arrived comatose and was pronounced neurologically dead two days later. The cause of death was " 'craniocerebral trauma.' "

Prior to his death, the medical center notified the Yolo County Sheriff's Office about Aaron's condition and the doctors' suspicion that it was the result of child abuse. Doctors noted Aaron was in critical condition, having suffered recent trauma to the head and injuries to his chest and eye, and not expected to live. The injuries appeared to be recent.

Police arrested defendant on November 2, 1983.[1] Defendant entered a plea of guilty to second degree murder and was subsequently convicted. He was sentenced to 15 years to life in prison.

---

[1] Defendant's only prior incidents involving law enforcement were for traffic violations.

**Prison Experience**

>  *Discipline*

During his incarceration, defendant received three CDCR form 115 disciplinary memos in 1986. He was found guilty of rules violations involving work performance during work assignment, fraudulent use of the telephone, and fighting with an inmate.[2] The first two infractions were termed "administrative," and the fight incident was over property stolen from defendant.

>  *Personal Life*

In 1985 defendant married a woman with whom he had been friends since he was 15 years old. They had a daughter in 1989.

>  *Work Experience*

Defendant has worked throughout his incarceration. He worked in the laundry and as a custody clerk, clothing room clerk, dental lab technician, hobby shop clerk, lead clerk, program administrator's clerk, supply clerk, attendance clerk, medical clerk, and in other clerical positions at the prison.

>  *Education*

While incarcerated, defendant completed numerous educational programs. He completed an associate of science degree in psychology in 2010 and received a certificate of completion in vocational radiology. He is state certified in landscape maintenance and vector control from the Department of Pesticide Regulation.[3] In addition, defendant has

---

[2] A CDCR form 115 is a rules violation report that documents misconduct that "is believed to be a violation of law or is not minor in nature." (Cal. Code Regs., tit. 15, § 3312, subd. (a)(3).)

[3] Defendant testified his certification would enable him to work for any business needing any kind of agricultural spraying or pest and weed control.

numerous small business certificates from Golden Hill Adult School, including the air conditioning and refrigeration program and an HIV peer education program.

### *Self-Help Programs*

In addition, defendant completed a plethora of self-help programs. Defendant participated in the VOEG (victim/offender education group) program and the Arts in Corrections music program, and completed the Katargeo self-help program. He also completed the 12-step Love Lifted Me recovery program, attended alternatives to violence courses, and participated in parenting programs. Defendant completed Breaking Barriers and Pro-Literacy tutor training. He participated in Project Pride, Celebrate Recovery, the Life Transitions workshop, and the Beyond Anger program, and has been continuously involved in Alcoholics Anonymous and Narcotics Anonymous since 1994.

Defendant participated in numerous other self-help programs from 1984 to the present. Defendant stated: "I have attended every anger management, conflict resolution, alternative to violence or parenting class ever offered at any prison I have been housed in."

### *Psychological Programs and Evaluations*

As for participation in psychological programs, defendant completed the "Category 'X' program." In 1987 and 1990 Category X reports diagnosed defendant with "Amphetamine and Cannabis Abuse, in institutional remission." The 1990 report added a diagnosis of "Impulse Control Disorder."

A 1994 Category X evaluation report diagnosed defendant with "Intermittent Explosive Disorder," "Polysubstance Abuse (Methamphetamine, Alcohol and Canabis [*sic*] Abuse, in institutional remission," and "Personality Disorder NOS" and recommended he continue in substance abuse groups, self-esteem groups, groups for men who have murdered children, and any individual therapy to help him break through his denial and address his crime.

5

In 1997 a psychological evaluation prepared for the Board of Prison Terms noted that a previous report found defendant had " 'matured significantly over the past ten years and that he posed [*sic*] no significant mental disorder which would preclude his being released to the community.' "

The psychologist found defendant courteous and cooperative, and noted: " 'In discussing the offense, he responded intellectually by enumerating the various antecedents which contributed to the offense which included an array of psychological mechanisms. He explained that he had a big argument with the victim's mother the day before and that his job had been terminated . . . . He stated that he had spent the previous evening snorting methamphetamine and was awake all night until the next day. When it was suggested to him that his offense was the result of his own selfish desire to be unencumbered and his feelings of anger at being awakened to attend to the two-year-old victim, he became quite emotional while tearfully admitting to these feelings. He went on to express his guilt and remorse and noted that he thinks about the crime on a daily basis.' "

A 2004 psychological assessment noted that since the Category X report defendant had participated in anger management groups, individual therapy, and group therapy. In 1997 and 1998 defendant sought help in dealing with his troubled feelings. The report found defendant had learned to utilize treatment and, unlike his behavior prior to the murder, did not hesitate to ask for help when needed.

The psychologist who performed the 2004 assessment concluded: "In my opinion, Mr. Fowler's level of risk of re-offense is very low. . . . Mr. Fowler has matured considerably since the time of the crime, he has engaged in ongoing introspective processes with measurable changes in the troubling personality features that contributed to the offense. . . . He is genuinely remorseful for the offense and he is committed to substance abuse/dependency recovery."

6

In 2007 a psychological evaluation noted defendant acknowledged his crime and accepted full responsibility for his actions. Defendant stated "he [did] not have a total understanding of why he committed what he characterize[d] as a horrible crime." Defendant knew his use of drugs, his lack of understanding of his own emotions, and his inability to express himself well contributed to the crime. The evaluation found defendant posed a low likelihood of recidivism.

Following several decisions denying defendant parole, the Board in 2009 again denied parole. The Board noted a great deal of concern about defendant's insight into the crime. The Board noted defendant did not have "a reasonable answer or any answer as to why you did this . . . and did not get the sense that you've done the kind of insightful deep work that it takes. It has nothing to do with tears, not having tears or having tears. It has to do with the depth of your comments. And we felt that a number of your comments were very superficial."

In a 2010 comprehensive risk assessment, the psychologist, Dr. Michael Venard, noted prior concerns about defendant's inability to recognize his emotions and manage his anger. However, Dr. Venard's interview with defendant revealed what appeared to be a genuine sense of remorse. Defendant expressed sadness and shame for his actions, articulating an awareness of why Aaron's family would harbor anger and resentment. According to Dr. Venard, "His expressions of remorse went beyond the cost to himself or simply toward the victim, suggesting he does appreciate the magnitude of his actions and the impact of the life crime on others who continue to live with the ramifications of that incident. His account of the life crime suggests he has moved beyond blaming or avoidance and has come to terms with his own role in the death of the victim."

Defendant also provided an explanation of the motivation for the murder but stated he was not trying to excuse his actions. Venard notes: "He cited previously noted emotional repression and irritability, coupled with sleep loss and an inability/ unwillingness to recognize the extent of his past anger problems. . . . He described

feeling a mixture of guilt, anger and sadness when he went to sleep prior to the life crime, saying he had felt 'trapped' by his life circumstances. Mr. Fowler said these feelings all merged into the rage he exhibited toward the victim when he could not stop the child from crying."

**Board's Grant of Parole**

In November 2010 the Board held another parole hearing. The Board asked defendant how he currently felt about Aaron's death. Defendant answered: "I feel terrible, Sir." When asked why he murdered Aaron, defendant responded: "I had . . . a problem with chronic inattentiveness to my own emotions. I wasn't in touch with them. There were many, many factors in play that day, and all of them were my responsibility. They were my fault."

Defendant took full responsibility for his actions and stated he had been under the influence of marijuana. He stated he had also used methamphetamine the night before the murder. The day of the murder he was sleep deprived and frustrated. He described the person he was in 1983 as "a mess . . . an overwhelmed, immature person," unable to take responsibility for his actions. Defendant's substance abuse problems led him to make bad decisions. In 1983 he was "living the selfish life of an addict." Defendant stated he had no desire to return to the kind of person he was in 1983 or to relieve his feelings by turning to drugs.

The Board reviewed the type of community work defendant would like to do if he were released from prison, as well as the education and self-help programs he had completed while incarcerated. In addition, the Board noted several letters of support for defendant's parole, and his family's willingness to support him and house him should he be released.

The Board concluded defendant was suitable for parole and would not pose an unreasonable risk of danger to society if released from prison. In granting parole, the Board considered the fact that defendant's crime was particularly disturbing, troubling,

8

and offensive. However, the Board also noted defendant's lack of a prior criminal history.

The Board went into detail on the issue of defendant's remorse for the murder of Aaron, stating it believed "you indicate you show a true understanding of the nature and magnitude of the commitment offense with respect to remorse, and that's based on the psychological report. . . . You show that you have insight into the causative factors of your conduct."

In support, the Board referred to the psychological report by Dr. Venard, which stated defendant had "learned to use more positive self-talk, a cognitive treatment technique, meditation, and peer support to help validate or challenge his feelings when he's under stress. And then he cited remorse over the life crime as the single most painful emotion he addressed. He says he has struggled to learn to live with this emotion without becoming overwhelmed by negative emotions that could undermine his ability to remain focused on positive objectives. And as he discussed these aspects of his life, Mr. Fowler expressed an adequate degree of awareness regarding his past inability to recognize emotions, and an inability and unwillingness to manage the anger that was easily triggered because of his already poor self-image." The Board also cited Dr. Venard's summary of prior psychological evaluations as supportive of a finding that defendant appreciates the magnitude of his actions, has moved beyond blaming or avoidance, and has come to terms with his role in Aaron's death.

The Board noted defendant had previously been denied parole based on a lack of insight. The Board concluded: "That has been sufficiently addressed here with this hearing here today."

**The Governor's Decision**

In April 2011 the Governor reversed the Board's grant of parole. The Governor acknowledged defendant's efforts to improve himself while incarcerated, as well as his volunteer activities. However, the Governor found these positive aspects of defendant's

9

incarceration outweighed by negative factors demonstrating defendant's unsuitability for parole.

The Governor described the murder of Aaron as appalling and senseless, noting that the baby was the most vulnerable and helpless of victims. According to the Governor, defendant attacked Aaron for "inexplicable reasons."

The Governor concluded: "When I look at this killing, I find that Mr. Fowler has offered no credible explanation. He says that he was experiencing stress and anger in his relationship with Aaron's mother, and difficulty in sleeping. So what. Any parent or person who cares for a baby encounters sleep difficulties as a matter of course. And relationship-related stress and anger do not explain and certainly do not justify Mr. Fowler's violation and killing of this defenseless child. The utter inhumanity of Mr. Fowler's crime coupled with his inability or unwillingness to understand, own, or achieve some credible level of insight tells me that there is substantial risk of danger to the public were he to be released from prison." Accordingly, the Governor found defendant currently poses a danger to society if released from prison.

**Petition for Writ of Habeas Corpus**

Defendant filed a petition for a writ of habeas corpus in the trial court. The trial court denied the petition, stating: "The conclusions articulated by the Governor are sufficiently supported by some evidence that the petitioner continues represents [*sic*] an unreasonable threat to public safety." Subsequently, defendant filed a petition for a writ of habeas corpus in this court. We issued an alternative writ.

## DISCUSSION

### I.

It is within the power of the Legislature to mandate that persons who commit heinous crimes serve the remainder of their lives in confinement, without possibility of parole, and the Legislature has so provided with respect to certain categories of murder in the first degree. (Pen. Code, § 190.2.) As to other deadly offenses, including second

10

degree murder, the Legislature has recognized the possibility of redemption and the ability of even a murderer to reintegrate into society as a constructive citizen. Though a defendant may be sentenced to life imprisonment, the Penal Code regulations promulgated thereunder do not presuppose that such a sentence will be carried through to completion. To the contrary, one year before the prisoner's minimum eligible parole date, a Board panel that meets with the inmate "shall normally set a parole release date," and shall do so "in a manner that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public." (Pen. Code, § 3041, subd. (a).) A parole release date shall be set unless the Board determines the "gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen. Code, § 3041, subd. (b).)

Few crimes are more horrendous than the death of an infant at the hands of an irate adult venting anger provoked by childish behavior. No victims are more innocent, no death so consequential as the murder of a young child. The Legislature could mandate that murder under such circumstances should be punished by life without the possibility of parole. It has not. Penal Code section 3041 and the regulations promulgated thereunder make the circumstances of the offense pertinent only insofar as they inform regarding the inmate's threat to public safety. Revulsion at a defendant's actions, standing alone, does not provide a basis for the Board, the Governor, or the courts to deny parole to an otherwise eligible inmate.

Under Board regulations the panel must determine whether the inmate is suitable for parole regardless of the length of time served. A life prisoner will be denied parole if the panel determines the inmate will pose an unreasonable risk of danger to society if released from state prison. (Cal. Code Regs., tit. 15, § 2402, subd. (a).) A parole date set

under the regulations "shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public." (*Id*. at § 2401.)

The Board considers six factors tending to show an unsuitability for parole: (1) commission of the offense in an especially heinous, atrocious, or cruel manner; (2) a previous history of violence; (3) an unstable social history; (4) prior sadistic sexual offenses; (5) a lengthy history of mental problems; and (6) serious misconduct in prison or jail. (Cal. Code Regs., tit. 15, § 2402, subd. (c).)

Alternatively, the Board considers nine factors evincing a suitability for parole: (1) the absence of a juvenile record; (2) a history of reasonably stable social relationships; (3) tangible signs of remorse; (4) the commission of the crime resulted from significant stress, especially if the stress built over a long period of time; (5) battered woman syndrome; (6) lack of a history of violent crime; (7) increased age, which reduces the possibility of recidivism; (8) marketable skills or a reasonable plan for the future; and (9) responsible institutional behavior. (Cal. Code Regs., tit. 15, § 2402, subd. (d).)

The Board exercises its discretion in determining the importance of these factors. (Cal. Code Regs., tit. 15, § 2402, subds. (c), (d).) In reviewing the Board's parole decision, the court considers only whether some evidence in the record supports the decision based on the factors specified in the statute.

The Board's parole decision is subject to review by the Governor. "The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action." (Cal. Const., art. V, § 8, subd. (b); see Pen. Code, § 3041.2.) The Governor must give individual consideration to the prospective parolee and consider all relevant statutory factors related to the inmate's postconviction behavior and rehabilitation. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1219 (*Lawrence*).)

12

Our review of the Governor's decision is conducted under the highly deferential "some evidence" standard. We uphold the Governor's decision unless it is arbitrary or procedurally flawed. We review the entire record to determine whether a modicum of evidence supports the decision. We do not ask whether the defendant is currently dangerous; that question is reserved for the executive branch. Instead, we consider whether there is a rational nexus between the evidence and the Governor's ultimate determination of current dangerousness. We do not reweigh the evidence. (*In re Shaputis* (2011) 53 Cal.4th 192, 221 (*Shaputis II*).)

We review the Governor's decision to ensure that it satisfies two due process imperatives. First, we determine whether the Governor's decision reflects due consideration of all statutory factors, and secondly, if it does, whether the analysis is supported by a modicum of evidence in the record, not mere guesswork, that is rationally indicative of current dangerousness. (*In re Young* (2012) 204 Cal.App.4th 288, 304.)

## II.

In reversing the Board's grant of parole to defendant, the Governor focused on two factors: "The utter inhumanity of Mr. Fowler's crime coupled with his inability or unwillingness to understand, own, or achieve some credible level of insight." These two factors, the Governor concluded, rendered defendant's release a substantial risk to public safety.

## III.

The Governor described the murder of Aaron as appalling and senseless. The Governor noted defendant berated the child, hitting Aaron so hard he fell to the floor and went limp. Even after seeing he had injured Aaron, defendant kept attacking the baby, picking him up and throwing him to the floor again, causing Aaron to hit his head. Defendant's brutality caused Aaron to go into a seizure. The Governor concludes that defendant "chose to unleash his rage on the most vulnerable and helpless of victims.

13

Baby Aaron could not run from the attack. Nor could he defend himself in any way. And Mr. Fowler attacked baby Aaron for inexplicable reasons."

One of the factors suggesting unsuitability for parole is that the murder was committed "in an especially heinous, atrocious or cruel manner." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).) The elements to be considered in assessing the gravity of the commitment offense include: "(A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense." (*Ibid.*)

We cannot take exception with the Governor's observation about the "utter inhumanity" of defendant's criminal act. Humanity is necessarily lacking in all murders that, by definition, involve callousness, some lack of emotion or sympathy, emotional insensitivity, and indifference to the feelings and suffering of others. (*In re Lee* (2006) 143 Cal.App.4th 1400, 1410.) The murder of a child is especially depraved.

Even attributing heinousness to the crime, this event alone as a static, historic fact is not a basis for parole denial unless there is an evidence-based rational nexus between the offense and present behavior. Something about the crime must interrelate with other dynamic factors to make it relevant to defendant's current dangerousness. (*Coronel*, *supra*, 210 Cal.App.4th at pp. 1243-1244.)

Here, the Governor's invocation of the horrific manner of Aaron's death hinges on the "inexplicable reasons" for defendant's attack on the baby and defendant's lack of a "credible explanation." These observations implicate the Governor's second basis for the denial of parole: lack of insight into the murder. We examine this factor in some detail.

14

## IV.

The Supreme Court has expressly recognized that the presence or absence of insight is a significant factor in determining whether there is a "rational nexus" between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety. However, the court also noted, lack of insight, like any other parole unsuitability factor, supports a denial of parole only if it is rationally indicative of the inmate's current dangerousness. (*Shaputis II, supra,* 53 Cal.4th at pp. 218-219.)

Although a defendant's insufficient understanding of the causes of his crime is a factor that may show him unsuitable for parole, it is not enough to establish that his insight is deficient in some specific way. (*In re Morganti* (2012) 204 Cal.App.4th 904, 923 (*Morganti*).) "If simply pointing to the existence of an unsuitability factor and then acknowledging the existence of suitability factors were sufficient to establish that a parole decision was not arbitrary, and that it was supported by 'some evidence,' a reviewing court would be forced to affirm any denial-of-parole decision linked to the mere existence of certain facts in the record, even if those facts have no bearing on the paramount statutory inquiry. Such a standard, because it would leave potentially arbitrary decisions of the Board or the Governor intact, would be incompatible with our recognition that an inmate's right to due process 'cannot exist in any practical sense without a remedy against its abrogation.' [Citation.]" (*Lawrence, supra,* 44 Cal.4th at p. 1211.) Not only must there be some evidence to support the Governor's factual findings, there must be some connection between those findings and the conclusion that the defendant is currently dangerous. (*Morganti, supra,* 204 Cal.App.4th at p. 923.)

The Governor found defendant lacked insight because he "offered no credible explanation" as to why he reacted so brutally against defenseless Aaron. According to the Governor, "Other than the fact that Fowler was tired and stressed from relationship problems, and that he had been awake all night because he used methamphetamines the

15

day before, Fowler has not articulated how he could lose control and act on his rage toward baby Aaron in the manner that he did."

The Governor cites defendant's statement at the November 2010 hearing that he had a " 'problem with chronic inattentiveness' " and that " '[t]here were many, many factors in play that day, and all of them were my responsibility.' " The Governor faults defendant for failing to identify these factors. Defendant also stated he should be released from jail because he "truly addressed the issues that brought [him] here." The Governor again faults defendant for failing to identify those issues, other than to "regurgitate the usual excuse that he was addicted, insecure, and felt inadequate." The Governor also criticizes defendant's "general" response when asked for specific examples of how he had impacted Aaron's family. Defendant responded, "there isn't any part of the life of Aaron's family that has not been impacted by the crime that I committed." Finally, when asked where the anger that caused him to beat Aaron to death had come from, defendant responded, "[t]he anger came from the frustration of the many factors that were in play during that particular time." The Governor takes issue with defendant's failure to identify those factors.

After reviewing the entire record we find no evidence, not in the psychological evaluations nor in defendant's statements to the Board nor in defendant's conduct in prison, indicating that defendant lacks insight into his actions the night of the murder. Nothing in the record indicates defendant fails to appreciate his own responsibility for Aaron's death.

To the contrary, in the 2010 psychological evaluation, Dr. Venard concluded defendant's insight into his past emotional instability "is appropriately developed and has been incorporated into his daily behavioral/social choices." Further, defendant's account of the murder "suggests he has moved beyond blaming or avoidance and has come to terms with his own role in the death of the victim." Dr. Venard concluded defendant presented a relatively low risk for violence.

16

In 2007 a psychologist found defendant demonstrated adequate insight and posed a low likelihood of reoffending if released.  The psychological assessment in 2004 found defendant's risk factors had been significantly reduced.  Defendant had matured considerably and had engaged in "ongoing introspective processes with measurable changes in the troubling personality features that contributed to the offense."  The psychologist observed, "He is genuinely remorseful for the offense" and determined defendant's risk of reoffense was very low.

During his parole hearing, defendant took full responsibility for his actions the night of the murder and expressed remorse over Aaron's death.  After stating many factors had been in play the day of the murder, defendant pointed to his use of marijuana and methamphetamine.  Defendant also described himself as sleep deprived and frustrated the day of the murder.  At the time of the murder, defendant characterized himself as an overwhelmed, immature person, unable to take responsibility for his actions.

Given the record before us, it appears the Governor's concern is not the absence of defendant's insight, but the sufficiency of his understanding of his actions in killing Aaron.  The Governor states he "was concerned with Fowler's present mindset regarding his criminal actions.  While he professed to accept responsibility, Fowler's justification for the murder fails to show an adequate level of insight or understanding."

However, as other courts have noted, it is questionable whether anyone can ever fully comprehend the myriad circumstances, feelings, and forces that motivate conduct, let alone misconduct.  (*In re Ryner* (2011) 196 Cal.App.4th 533, 548 (*Ryner*).)  As the court in *Morganti* explained, "we question whether anyone can ever adequately articulate the complexity and consequences of past misconduct and atone for it to the satisfaction of everyone."  (*Morganti*, *supra*, 204 Cal.App.4th at p. 925.)  Expressions of insight and remorse vary from defendant to defendant, and there is no special formula for a defendant

17

to articulate in order to establish that he has gained insight into his crime. (*In re Shaputis* (2008) 44 Cal.4th 1241, 1260, fn. 18; *Shaputis II*, *supra*, 53 Cal.4th at p. 219, fn. 12.)

Regardless of the sufficiency of defendant's insight and understanding, the question is whether defendant constitutes a current threat to public safety. There must be a connection between any lack of insight on defendant's part and the Governor's conclusion that he is currently dangerous. (*Morganti*, *supra*, 204 Cal.App.4th at p. 923; *Lawrence*, *supra*, 44 Cal.4th at p. 1212; *Coronel*, *supra*, 210 Cal.App.4th at p. 1248.)

Our review of the record reveals no evidence connecting any arguable lack of insight to the conclusion that defendant would present a risk to public safety if released on parole. Defendant's positive behavior in prison, his lengthy participation in seemingly every available rehabilitative program and volunteer program while incarcerated, and his statements to psychologists and the Board do not establish any likelihood defendant would pose a risk to public safety if released on parole. In addition, none of the psychologists who evaluated defendant believed he posed such a risk.

We are mindful that the "some evidence" standard is extremely deferential, that we must examine the record in the light most favorable to the Governor's determination, and that only a modicum of evidence is necessary to support the determination. (*Lawrence*, *supra*, 44 Cal.4th at p. 1213.) However, a determination that a defendant is currently dangerous because he lacks insight cannot be predicated on a hunch or intuition. (*Id*. at p. 1213.)

Where, as here, a review of the record reveals that a defendant has acknowledged the material aspects of his or her conduct and crime, shown an understanding of its causes, and demonstrated remorse, the Governor's "mere refusal to accept such evidence is not itself a rational or sufficient basis upon which to conclude that the inmate lacks insight, let alone that he or she remains currently dangerous." (*Ryner*, *supra*, 196 Cal.App.4th at p. 549.)

18

When the basis for the Governor's determination lacks any evidentiary support and conflicts with the evidence in the entire record, it is arbitrary and capricious. It is not rational. Here, the record supports the Board's finding that there is no evidence defendant lacks insight and understanding of his murder of Aaron which renders him a danger to public safety if released. The record does not establish a link between any alleged lack of insight and the conclusion that defendant is currently dangerous. (*In re Pugh* (2012) 205 Cal.App.4th 260, 275 (*Pugh*).)

## V.

As we noted in *Pugh*, *supra*, 205 Cal.App.4th 260, "[s]everal Courts of Appeal, including this court [citation], have concluded that the proper remedy when vacating the governor's parole decision is to reinstate the Board's grant of parole and require the inmate to be paroled in accordance with the reinstated Board decision. [Citations.] We agree with the reasoning of these cases, and we adhere to their approach." (*Id*. at p. 276.) Accordingly, as in *Pugh*, we conclude the proper remedy in this case is to reinstate the Board's 2010 decision and require defendant be granted parole on terms and conditions consistent with the Board's 2010 decision.

## DISPOSITION

The Governor's decision reversing the Board's November 8, 2010, decision granting defendant parole is vacated and the Board's parole release order is reinstated.

                                                          RAYE          , P. J.


We concur:


      NICHOLSON      , J.


      BUTZ          , J.


19