[No. G046189. Fourth Dist., Div. Three. Aug. 31, 2012.]

In re ADAM SANCHEZ on Habeas Corpus.

## COUNSEL

Rich Pfeiffer for Petitioner Adam Sanchez.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Phillip Lindsay and Michael Rhoads, Deputy Attorneys General, for Plaintiff and Respondent the People.

## OPINION

**ARONSON, J.**—Adam Sanchez challenges on habeas corpus the decision of the Board of Parole Hearings (Board) finding him unsuitable for parole at his third parole eligibility hearing, 17 years after he shot and paralyzed a rival gang member in a driveby shooting Sanchez committed when he was 16 years old. Among other findings, the Board concluded Sanchez posed a danger to society if released on parole because he did not admit he directed the driver, a more senior member of Sanchez's gang, towards Bristol Street in Santa Ana, where they came upon the eventual victim riding his bicycle. The Board also found probative of future dangerousness Sanchez's denial he was a "vice president" of his gang. He acknowledged that though he had only been a member for nine or 10 months, his peers in the "juvenile, youngsters" wing of the gang may have viewed him as a leader because of his "commitment to the gang," but he explained there was no "vice president" or similar title available to young members.

As we explain, the record does not support the Board's conclusions Sanchez minimized his role in the offense or in his gang, or that the commitment offense alone or his assertedly "unstable social history" made him unsuitable for parole. Absent the requisite "nexus between the evidence and the ultimate determination of current dangerousness" (*In re Shaputis* (2011) 53 Cal.4th 192, 221 [134 Cal.Rptr.3d 86, 265 P.3d 253] (*Shaputis II*)), we grant Sanchez's petition to vacate the Board's 2010 parole denial and order a new parole hearing. Because a new hearing is required, Sanchez's ex post facto challenge to the Legislature's increase in the minimum interval between parole hearings (Pen. Code, § 3041.5 (Marsy's Law)) is moot.[1]

I

### FACTUAL AND PROCEDURAL BACKGROUND

A jury convicted Sanchez of attempted murder (§§ 664, 187) and shooting from a motor vehicle (former § 12034, subd. (c), see now § 26100, subd. (c))

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

in the underlying May 1993 offense, for which he received a life term with the possibility of parole, and the jury additionally found Sanchez personally used a firearm in committing the crime (§ 12022.5) and inflicted great bodily injury (§ 12022.7; former § 12022.9) on his victim. As Sanchez later made a point to say in his psychological evaluation in 2008, "His name is Jose Salas. I feel bad for that person. Some people wonder why I say his name—he is still a person, not just a victim. Some people say that he was a gang member and you were a gang member—do you not think that he would have done to you what you did to him? And I tell [them] that whether or not he would have, it doesn't justify what I did. Because we were all brainwashed in that area. They make you believe that everything is fine and good—they try to give you the family love and structure, supposedly. They think you are young and all they have to do is win you over with stuff. Or acceptance. And then you are in prison and you start to grow and you start to see that it is all a game," a false illusion.

The interviewing psychologist observed the remorse Sanchez felt "for his behavior and the consequences to the victim" appeared genuine, including statements like the following: "I understand what I did to Jose and his family. I understand what I did to my family and the community." "Just thinking about [Jose], not being able to walk, not being able to do activities. His family has to care for him the rest of his life. And to realize that is my result [*sic*]. It hurts. Because I know that anything I do will not bring back his ability to walk again. If I had a chance to speak to him, I would tell him my part about it, in hopes to bring some peace or calmness. Sometimes I wonder if I was to do that, would I bring up old wounds." In 2008, Sanchez wrote indirectly to Salas, by way of a letter to Salas's cousin, so as not to "open up any old wounds or offend anyone," and expressed he was "truly sorry for the trouble and hurt I've caused," which prompted the cousin, who was "like brothers" with Salas to write back. As the Board commissioner recounted: "[H]e's asking that we trust you and give you your freedom. It says your family has suffered enough as well. I've been praying that you'll be given a second chance. Our entire family would like to see you succeed and prove yourself. At least someone in this case will go on with their lives and be successful. We keep praying that he has the opportunity to redeem himself."

Nothing, however, could change the cowardly and vicious nature of Sanchez's commitment offense. On May 14, 1993, he and three other members of the Seventh Street gang spotted Salas and his brother Juan, members of the El Salvador Park clique of Seventh Street's rival, F-Troop, riding their bicycles in the same direction as the vehicle in which Sanchez rode "shotgun" near Bristol Street. The driver of the vehicle, Rosalio Ybarra, already a longtime Seventh Street member at age 19, bore down on the Salas brothers from behind when a truck, apparently unconnected to the impending confrontation, "swerved toward Jose and bumped his bicycle as it passed,"

according to the appellate opinion affirming Sanchez's conviction on direct review. The opinion further recounted: "Ybarra's car followed closely behind with its high beams on and Sanchez leaning out the front passenger window. At close range, Sanchez fired a round from a .380 caliber handgun into Jose's back, leaving him paralyzed from the waist down. As Ybarra drove off, Juan heard one of the passengers yell, 'Seventh Street!' while another flashed 'five deuce,' the gang's hand sign." Sanchez claimed he did not know until he was arrested months later that any of the shots he fired struck Jose.

The appellate opinion affirming Salas's conviction attempted to place the shooting in a broader context concerning Seventh Street's "breakup" from the larger F-Troop gang. After the dissolution, Seventh Street members "found themselves occupying territory that partially overlapped the El Salvador Park chapter of F-Troop, whose members became their fierce enemies." But the opinion acknowledged in a footnote that the notion Salas's shooting was "payback" for F-Troop's assassination of a Seventh Street member was merely "represent[ed]" by the Attorney General on appeal and had not been part of the trial record. The opinion further stated that "[b]y late spring [of 1993], Adam Sanchez was vice president of the Youngsters of the Seventh Street gang (a group of youth affiliates) and an associate of the gang's president," and that during the commitment offense Sanchez "instructed Ybarra to drive down Civic Center Drive West and go south on Raitt Street—into an area controlled by El Salvador Park," and thereafter "directed Ybarra down Santa Ana Boulevard toward Bristol Street," where they encountered the Salas brothers on their bicycles.

The appellate opinion also recounted some details from the trial record, including: "Questioned after the shooting, Juan Salas told police Sanchez and [Jose] had experienced a 'problem' in the past, and [Juan] had been present when Sanchez pulled a gun on the two of them, asking if they wanted to die. Freddy Solis, one of Sanchez's former friends, testified that, after Jose Salas was shot, Sanchez bragged to some girls, saying he had gotten 'that tramp' [(a derogatory Seventh Street reference to F-Troop members, per a footnote in the opinion)] and had 'fuckin' nailed that tramp,' referring specifically to Jose Salas's moniker—'Gadget.' "

Sanchez apparently had been housed in juvenile facilities until the trial court's amenability determination at sentencing in 1996, when the court placed him at the California Youth Authority, but then he was soon transferred to state prison because he was already 19 years old. He described to the Board his arrival at prison: "[W]e got there at nighttime. It was cold." "There was seven of us . . . from the age of 16 to 19." "When we got off the bus, I remember the officer there told us that the yard we're going to, it's a hostile area, and to bring awareness to us [*sic*] . . . that [in] the building that

we're going to an inmate was killed and to be aware of our surroundings and people. I remember just feeling scared at that moment and, you know, very cautious about everything."

In this environment, Sanchez continued to delude himself that after his arrest and through his early years of incarceration, "I was just mingling with whoever they put me with. Some who associated [with gangs] and some who didn't." He believed when he began reading the Bible in 1997 and "started hanging around with spiritual people" that he had left his former life behind. But he acknowledged in his 2008 psychological evaluation, "I thought I stopped doing those types of things, until some people came up to me and asked me to hold a weapon for them" in 1998. Accepting a knife, which he apparently concealed at times in his rectum, Sanchez "thought I was [simply] surviving," which he rationalized on grounds "I wasn't going to hurt anyone," but he later recognized his delusion: "I was still associating. . . . Even though I was saying that I was hanging around with [spiritual] brothers, I was hanging around with *them* [(members of the Southerners prison gang)]." (Italics added.)

Prison authorities discovered the knife and Sanchez was sentenced in 1998 to two additional years for "Prisoner in Possession of an Instrument (Weapon)." (§ 4502, subd. (a).) He was not so involved with the Southerners that he had to "debrief," given he was not "involved in assaults or violence," and the prison gang apparently similarly viewed him as a peripheral figure since he faced only "verbal abuse" in charting a separate path after his possession conviction. He explained to the Board "that was my turning point," "I knew that I had to start taking action [to move] my life in the right direction." "[T]hat's when I s[aid], you know what? That's it, man. You know, you've got to stop being a little coward."

According to Sanchez, "[E]ver since then I've pushed forward. I have been asked to do certain things. I have been asked to participate in gang activity, but I've remained strong and I've said no," despite potential repercussions. He began pursuing his education in earnest, and took pride in obtaining his GED and enrolling in college, spending as many as six or seven hours a day on his studies. He attributed his change in attitude and behavior to "hav[ing] a spiritual relationship with God" and noted, "All that change started when I started to understand my crime. When I understood who I was hurting."

Sanchez's original probation report included "a past diagnosis of Alcohol Abuse," which the prison psychologist observed no documented history supported, but Sanchez reflected that while he "didn't have an addiction, . . . when I looked at Step One, I saw that my life was unmanageable. . . . I used

the 12-step principles to help understand my situation and to mature." Accordingly, he participated in "AA and NA" programs regularly throughout his incarceration.

Apart from his major disciplinary violation for holding a weapon in 1998, Sanchez's other three violations over 17 years appear to have been minor and, in any event, diminishing. He was cited for a rule violation in 1998 for "Disobeying a Direct Order" of an unspecified nature, and in 2003 he received "counseling chronos" warnings for "Altering State Property" and covering a cell room window. Seemingly more serious, a 2005 violation report noted "Conduct Which Could Lead to Violence," but the Board appears to have accepted Sanchez's explanation: "That was [when] I was in the yard. I was playing with somebody, horse playing. I understand that I wasn't supposed to do that. I was violating the rules. An officer saw us. They thought that we were fighting. They wrote us up for that. I took responsibility for that, and I told them that it was my fault, and I took the counseling from the sergeant and I never since then have done that again."

The Board denied Sanchez parole at his initial parole eligibility hearing in 2006. The Board recommended that Sanchez "get self-help, stay discipline free, learn a trade, continue to get therapy . . . and earn positive chronos."

Sanchez's 2008 psychological review showed a "low risk for future violence" based on three assessment focal points: psychopathy, dynamic risk factors, and management of future risk. As detailed in the psychologist's report, Sanchez scored low in the first domain based on tests assessing "the degree to which a person can be considered superficial, grandiose, deceitful, lacking in remorse and empathy, irresponsible, impulsive, lacking goals, behaviorally dysregulated, and prone to antisocial behavior." Indeed, he "score[d] well below the cutoff of 12, having a score of 5," and the psychologist therefore concluded that a "diagnosis of Antisocial Traits by history" in Sanchez's initial probation report "does not appear to be an accurate reflection of the inmate at this time." Sanchez also scored well in the second domain concerning "dynamic risk factors of lack of insight, negative attitudes, active symptoms of a mental illness, impulsivity, and lack of response to treatment . . . ." The report noted no symptoms of mental illness and that "Sanchez has insight into his crime and does not have negative attitudes. . . . He appears to have remorse for his crime and empathy for the victim and the victim's family."

In the third domain, management of future risk factors, the report observed Sanchez had sound plans for his eventual release: "His family is willing to provide a place to live, social support, and necessary employment. The inmate may have some inevitable exposure to destabilizers, but he appears to

have a stable environment in the community. There is no evidence that he will be exposed to a criminal element in his social support." Sanchez recognized the destabilizing nature of his gang involvement and therefore confirmed arrangements to live with an uncle in Victorville or an uncle in Corona, both "far removed from his old neighborhood," thus "minimiz[ing] contact with the 7th [S]treet gang . . . ." The report noted no history of "mutual substance abuse in his relationships," "no evidence of a pattern of chaotic or stormy relationships," nor of illegal sources of income such as selling drugs, nor any other destabilizers.

To the contrary, Sanchez "gets along well with supervisors and co-workers," received laudatory reports from his vocational patrol officer and a behavior commendation during a prison riot, and had created a positive network in which "he socializes in his self-help groups" and associated with, as Sanchez described them, "[m]y spiritual brothers—people who have been receiving [parole] dates." He explained, "I get inspiration, encouragement. It is better to be around positive people who are going somewhere, not being around people who have given up. I have to remember how I got to prison." The psychological report concluded with an overall risk assessment that Sanchez "would have a low likelihood to become involved in a violent offense if released into the free community."

The Board denied Sanchez parole at his 2008 hearing. The Board cited the "especially heinous, atrocious, and cruel manner" of his commitment offense, given it was "carried out in a dispassionate and calculated manner such as an execution style murder." The Board also found "some significance" in Sanchez's "prior criminality," which consisted of a sustained delinquency petition for holding a gun for fellow gang members in an automobile stopped by the police, for which he received probation, and the Board also cited his arrest for grand theft before his commitment offense. The Board found Sanchez had failed at earlier "remediation" opportunities, specifically by violating probation twice: first leaving home without an adult to register for school though he was "under house arrest" as a probation term, and also by not proceeding directly home that day but instead visiting a convenience store with a friend, and, second, for moving away from Santa Ana after the shooting to live with an uncle without notifying his probation officer.

The Board also noted that though Sanchez's "misconduct while incarcerated is comparatively light" and he had "significant self-help and educational improvements," it remained troubled by his 1998 possession conviction, particularly since it was gang related. "You say that the knife in your rectum was the turning point. We believe that because we believe you've made exceptional progress in that period of time. But we want you to look back in terms of your experience and reflect on that course you took on the Attitude

of Honesty and understand that you really have to understand this. You were pursuing a reckless gang-style life that led to the shooting that gave you this incarceration. Additionally we find that when you were incarcerated—that event with the knife in your rectum was 199[8]—still, up till 199[8] you were involved in a gang life style. Now you've changed, and you['re] making . . . progress, and . . . from that point of view we are impressed. We believe that you should seek additional self-help in recognizing responsibility."

The Board's comments reflected the deputy district attorney's argument opposing parole, specifically, "I read his statement [in which] he gave his version of events, this time accepting responsibility, but he still blames it on other[s], on peer pressure. Someone said to shoot them. The driver gave me back the gun and said to shoot, so I did." Sanchez responded, "I just want to say that I do agree with the DA. My crime was a horrible crime. I know that I didn't just—commit[] a terrible crime against the Salas family but as well as [*sic*: garbled] my community and home. At the time when I committed my crime, I was only 16 years old. I blame no one for what happened that day but myself. I know today that I had a choice to make that day, and I could have chose[n] not to participate, but instead I didn't think much of it, and I did it. So spending my time in prison these 14 years I have taken the time to reflect, to understand, and to assume responsibilit[y] for my actions." Unpersuaded, the Board denied parole for two years.

Before the August 2010 parole hearing, Sanchez submitted a statement to "res[cind] his version of the life crime" and replace it with the following: "I concur with [the] findings [and the appellate] opinion['s] statement of facts o[n] appeal."

Sanchez explained the change at the parole hearing. Noting that "in the last hearing, the Commissioners [had] pointed some things out," he wanted the Board "to know that I reflected on what they said to me." Specifically, "I understand that when I say that the driver gave me the gun or that somebody said to shoot, I see now that I'm actually throwing blame on the driver or on others as if they made me do it, and what I want to say today is that nobody made me do this. I'm not trying to say by *that* [(his recounting of the crime)] that I was pressured or . . . that I was forced to do anything. I'm just telling the story of what happened that day and how it led to that [(i.e., the shooting)]. . . . That was my decision. That was my decision that day to do that. I was pursuing a life of violence, a life of gangs, so when the opportunity came, I took it. I took it for my own reasons. So, when I say [my] statement [of what happened], I don't mean to say it as [if] I was forced in any way." (Italics added.)

Sanchez apologized that he was "not fancy with words," that, "[b]efore, I didn't know how to explain myself," and "sometimes I still might have . . .

trouble, you know, articulating myself." Consequently, he intended by "concur[ring]" in the appellate decision to avoid giving the impression that he denied responsibility for his offense or cast blame on his cohort that day.

To the contrary, he admitted he was "in control of the situation" when he shot the victim, that "nobody made me do this," but rather it "was my decision that day to do that" because he was "pursuing a life of violence, a life of gangs," in which he "knew that sooner or later I would have to do something like this" and thus no one was to blame but himself because he chose to "pursu[e] a gang lifestyle." Accordingly, he "underst[ood] that it's my responsibility, and I just want to say that I do not blame nobody for what happened here. It's my fault. I understand that I have to make amends as well for what I've done to my community, to the Salas family, to my family, and [the way] I do . . . that is . . . in [the prison] yard" each day.

There, he stayed discipline free and worked on his education, vocational training in roofing, culinary arts, and office work, and he applied himself in self-help programs, earning 38 certificates since 2008 for courses such as "Alternatives to Violence," Bible study, AA, "Identifying Violence in Life," "Creative Conflict Resolution," and "Reintegration Preparation." Since 2008, he had been the coordinator for the prison's inactive gang members workshop. He participated in a group putting on "drama plays" using role-playing about "being in gangs or being users, or living in a home where the parents are abusive," so "people can relate" and "be helped and turned around." Though other prisoners cast aspersions on his theater efforts, Sanchez persisted for those it helped because he wanted "to be part of the solution in gang violence" and, as he had done in the yard, he planned to remain "involved in church ministries" if released, serving as a mentor in schools, juvenile hall, back in prison or wherever needed to "share my testimony and try to help young men, old men to change their ways as well." He explained, "I try to do anything I can to show my amends because . . . it's [accomplished] through my actions," and he believed that his "actions are going to speak louder" than words.

The Board, however, continued to view the appellate opinion's narrative snapshot as controlling, specifically that Sanchez was a gang "vice president" who "instructed" Ybarra to drive into enemy territory. The Board regarded Sanchez's explanation at the hearing that the gang did not utilize hierarchical labels in the juvenile wing of the gang as "contradict[ing]" his acknowledgement his peers may have looked up to him because of his commitment to Seventh Street. The Board also felt Sanchez minimized his role in the offense by denying he directed Ybarra into enemy territory and explaining the shooting location "pretty much . . . at that time it was [a] mutual zone," contrary to the appellate opinion.

Sanchez's attorney argued "the fact that Mr. Sanchez has disputed some relatively small aspects of [the case] doesn't change the fact that he did what he was convicted of and that he admits that he did it, and he acknowledges that he's the one responsible for those actions." Counsel urged the Board to find Sanchez suitable for parole at the hearing because he would still "have another year to serve after that" for his 1998 possession offense, consecutive to his life term.

The Board denied parole for another three years, and Sanchez sought habeas corpus relief in the trial court. The court denied the petition, mentioning in its brief ruling "the crime itself," Sanchez's "criminal past," his "violation of probation," and his "involve[ment] in the gang activity and lifestyle from the age of 15." The court also noted Sanchez's 2005 rule violation, but did not acknowledge the Board appeared to accept Sanchez's explanation the incident consisted of horseplay for which he assumed responsibility and previously viewed his prison misconduct as relatively "light" overall.

Sanchez then filed his habeas corpus petition in this court, seeking to overturn the August 2010 Board's parole denial and to require a new parole hearing. We grant the petition, as we explain below.

## II

## DISCUSSION

■ By statute, the Board "shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." (§ 5011, subd. (b).) Similarly, "an inmate need not agree or adopt the official version of a crime in order to demonstrate insight and remorse." (*In re Twinn* (2010) 190 Cal.App.4th 447, 466 [118 Cal.Rptr.3d 399] (*Twinn*); accord, *In re Aguilar* (2008) 168 Cal.App.4th 1479, 1491 [86 Cal.Rptr.3d 498] [no requirement that prisoner must " 'admit his guilt or change his story to be found suitable for parole by the Board' "].) These rules follow from "the fundamental consideration in parole decisions," which is "public safety" (*In re Lawrence* (2008) 44 Cal.4th 1181, 1205 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*)), not readjudication of the offense, nor enshrinement of an official version of the crime. A "modicum" or "some" evidence (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 652, 658 [128 Cal.Rptr.2d 104, 59 P.3d 174]) must support the Board's conclusion the "inmate's release will unreasonably endanger public safety" (*Lawrence*, at p. 1209). "An inmate's lack of insight into, or minimizing of, responsibility for, previous criminality . . . is a relevant consideration." (*In re Lazor* (2009) 172 Cal.App.4th 1185, 1202 [92 Cal.Rptr.3d 36].) But "minor

discrepancies in an inmate's version of a crime do not standing alone demonstrate a rational nexus to current dangerousness." (*Twinn*, at p. 468; accord, *In re Moses* (2010) 182 Cal.App.4th 1279 [106 Cal.Rptr.3d 608].)

Here, the Board denied Sanchez parole on grounds he minimized his role in the offense and his gang, thereby demonstrating ongoing "criminal thinking that is actually fortified or reaffirmed within the gang culture that, you know, you try to avoid responsibility, shirk your responsibility . . . ." The Board found Sanchez posed a current risk of danger if released while still in the throes of this "criminal mentality," and also found Sanchez's unstable social history and the nature of the commitment offense made him unsuitable for parole.

The Board, however, reached these conclusions by enshrining the appellate opinion on direct review as "the official record that is recognized . . . not only by this Panel," but also "past Panels [and] future Panels . . . ." The Board erred in requiring "official record" fealty (see *Twinn, supra*, 190 Cal.App.4th at p. 466), but, more importantly, the discrepancies between Sanchez's account and the appellate opinion did not evidence continuing dangerousness. The Board reasoned that because Sanchez denied the so-called official account, he was shirking his responsibility for his offense and his gang entrenchment, and his lack of insight therefore posed a continuing threat to public safety.

The record does not support this conclusion, however, because in denying he was a gang vice-president or that he had directed Ybarra turn-by-turn into hostile territory, Sanchez made the point unequivocally and repeatedly that he bore *greater* responsibility and was more *deeply* entrenched in gang culture than the appellate record showed. He freely *disclosed* incriminating conduct absent from the appellate opinion demonstrating his commitment to the gang, including participating in gang brawls and another driveby shootout. He disclosed that even without hierarchical labels for junior members of his gang, his "actions and my commitment" were so pronounced that he could be viewed as a leader among his peers. He disclosed he *knew* as a gang member "sooner or later I would have to do something like this," yet he remained in the gang, and fired his gun when he had the "opportunity," for which he claimed *sole* responsibility. The Board incorrectly suggested Sanchez had to hew to an "official record" of the shooting, and we conclude this misunderstanding tainted the proceedings. Apart from Sanchez's inconsequential deviations from the so-called official version of events in the appellate opinion, the record cannot be reconciled with the conclusion Sanchez minimized his responsibility. Thus, the required "nexus between the evidence and the ultimate determination of current dangerousness" (*Shaputis II, supra*, 53 Cal.4th at p. 221) is absent.

That is not to say that *any* account of the underlying offense or an inmate's role in it *must* be accepted by the Board if it is plausible. In *In re Tapia* (2012) 207 Cal.App.4th 1104 [114 Cal.Rptr.3d 190] (*Tapia*), we acknowledged some courts had read into the rule that an inmate need not admit his guilt or accept the official version of an offense a questionable corollary that the Board must accept an account that is " 'not physically impossible and did not strain credulity.' " (*Id.* at p. 1113; see *In re Palermo* (2009) 171 Cal.App.4th 1096, 1112 [90 Cal.Rptr.3d 101]; accord, *In re Pugh* (2012) 205 Cal.App.4th 260, 266 [140 Cal.Rptr.3d 194] ["any difference in Pugh's version of the crime provides no evidence of current dangerousness where his version is not inherently incredible and is not inconsistent with the evidence established in the case"].)

We observed in *Tapia*, however, that this view "has been called into question" by the Supreme Court's decision in *Shaputis II*. (*Tapia, supra*, 207 Cal.App.4th at p. 1113.) In *Shaputis II*, the high court held not only that "an *implausible* denial of guilt may support a finding of current dangerousness . . ." (*Shaputis II, supra*, 53 Cal.4th at p. 216), but that credibility and therefore plausibility is for the Board to determine. Thus, when "the parole authority declines to give credence to certain evidence, a reviewing court may not interfere unless that determination lacks any rational basis and is merely arbitrary." (*Id.* at p. 215.) In *Tapia*, the parole board there reasonably concluded the inmate had not reformed because he endangered the public by refusing to disclose for 15 years, until the day of his first parole hearing, the identity of his accomplice in an attempted murder; nor was his denial of planning activity plausible.

Here, in contrast, the parole decision did not turn on the plausibility of Sanchez's account or more fundamentally on whether he posed a current danger if released, but instead on the Board's mistaken enshrinement of an official version of the offense. That misstep left no meaningful room to evaluate Sanchez's credibility or his insight, remorse, or manifest responsibility for his offense because no deviation from the official script would be tolerated. The error thus prevented any meaningful evaluation of the evidence and led instead to the unsupported and therefore arbitrary conclusion Sanchez rejected responsibility for his actions.

The Board's conclusions Sanchez's commitment offense and social history required denying parole are also unsupported. The presiding commissioner mentioned the commitment offense in a passing remark: "The commitment offense, I'll just throw that in there because that's the reason we're all here and it does tie, I think, to the whole mentality that you display or convey to this Panel in that this was certainly a gang-motivated crime, senseless." The Board also apparently concluded Sanchez's two probation failures 17

years earlier constituted an "unstable social history." But "immutable facts such as an inmate's criminal history" or the "circumstances of the offense" do not by themselves demonstrate an inmate "*continues* to pose an unreasonable risk to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1221, original italics.)

## III

## DISPOSITION

The petition is granted and the matter remanded for a new parole hearing.

Moore, Acting P. J., and Ikola, J., concurred.