Filed 4/21/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re TIMOTHY P. BUSCH<br><br>on<br><br>Habeas Corpus. | D068791<br><br><br>(San Diego County<br>Super. Ct. No. HCN 1400) |

Original Proceedings on a petition for writ of habeas corpus following the Governor's reversal of a grant of parole. Petition denied.

Benjamin Ramos, under appointment by the Court of Appeal, for petitioner.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Phillip J. Lindsay and Gregory J. Marcot, Deputy Attorneys General, for Respondent.

INTRODUCTION

A jury convicted Timothy P. Busch in 1989 of second degree murder of his girlfriend's two-year-old daughter. (Pen. Code, § 187.)[1] The court sentenced him to an indeterminate term of 15 years to life in prison. He was first eligible for parole in 1999.

The Board of Parole Hearings (Board) found Busch suitable for parole in 2014 based on his exemplary performance while incarcerated. However, the Governor exercised his constitutional and statutory authority to review the Board's parole grant and reversed the Board's decision concluding Busch's claim of innocence and his explanation for the child's injuries were entirely implausible and the evidence as a whole shows Busch currently poses an unreasonable danger to society if released from prison.

Busch filed a petition for writ of habeas corpus challenging the Governor's decision. Busch contends the Governor's decision is based upon Busch's failure to admit guilt in violation of section 5011 and the decision fails to articulate a rational nexus between the circumstances of the crime and his current risk of dangerousness. We issued an order to show cause why the relief requested should not be granted. After review of the record, we disagree with Busch's contentions and deny relief.

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

BACKGROUND

*Commitment Offense*[2]

Busch and his two-year-old son lived with Busch's fiancé and her two-year-old daughter, Shaena. On May 14, 1988, Shaena and Busch's son woke up Shaena's mother with their playing. Shaena ate a normal breakfast. Busch returned from a 24-hour duty at Camp Pendleton between 7:30 and 8:00 a.m. Shaena voluntarily went to her room to take a nap around 10:00 a.m. Although Shaena usually napped around noon under protest, Shaena had a cold and her mother had given her some cough syrup, which causes drowsiness in children. It was not uncommon for Shaena to nap when she had a cold.

Between 12:30 and 1:00 p.m., friends arrived with their children. The male friend was a Marine sergeant who worked with Busch and the two of them were studying for a Marine Corps course together. Shaena awoke shortly after the guests arrived and she ate very little lunch before going outside to play with the other children. Shaena ran, laughed and played with the other children both inside and out. She crawled into the female friend's lap and asked questions.

Shaena's mother left for work about 2:45 p.m. Other than the fact that Shaena was a little listless due to her cold, Shaena's mother did not notice anything unusual. She did not see any bruises on Shaena's face.

---

2      We draw the facts from the probation officer's report and our unpublished opinion in *People v. Busch* (Jan. 14, 1991, D010037) [nonpub. opn.].

3

After Shaena's mother left, the children continued to play while the men studied. At one point, Busch told them to quiet down. Busch spanked his son when he refused to go to his room. Shaena and Busch's son began to argue and Shaena sat on Busch's son's head.

Busch sent Shaena to her room as a disciplinary measure and followed her down the hall. When Busch returned 10 minutes later, he said Shaena was sick and he put her to bed. Busch later reported Shaena vomited in the hallway, he cleaned her up, and put her to bed in his bedroom.

Over the next hour, Busch checked on Shaena four or five times, approximately 10 minutes apart. When Busch returned from checking on Shaena at approximately 4:00 p.m. he was upset and said he found Shaena next to the bed breathing erratically. He said she must have fallen off the bed.[3] He asked the female friend to check on Shaena while he called Shaena's mother. Shaena opened her eyes and let out "a real light moan" when the friend touched Shaena's forehead. At Shaena's mother's direction, Busch took Shaena to the hospital.

When Shaena arrived at the hospital, she was in a coma and exhibited signs of severe injury. The emergency room physician who examined her found Shaena had a dilated right pupil, decerebrate posturing, and very shallow respirations. She was intubated and placed on a ventilator. The emergency room physician felt the injuries

---

[3] The top of the bed was 24 and one-half inches from the floor, which was carpeted and had one and one-half inches of padding.

were "typical of a child with a subdural hematoma" and were not consistent with the history provided by Busch and Shaena's mother. When the physician drilled bur holes in the skull, "fresh venous blood squirted out under pressure as the dura was incised. No definite clots were seen." The doctor believed Shaena's injury was not accidental because the circumstances of her injury were unclear and she had a serious head injury without being in an automobile accident or falling from a roof or other significant height.

Shaena was life-flighted to Children's Hospital where X-rays revealed two distinct skull fractures. The treating physician at Children's concluded Shaena suffered a massive head injury with "very fresh, acute left-sided subdural hematoma which resulted in intracranial pressure." The Children's physician also concluded the history from Busch could not possibly account for the injuries Shaena suffered. The physician testified Shaena's injuries were likely caused by a blunt blow to the head and, if she had fallen from a distance, it would have had to be at least 20 feet. Two days later Shaena was removed from life support and died.

We summarized the evidence regarding Shaena's injuries and evidence regarding the mechanism of injury in the direct appeal as follows: "The autopsy showed Shaena had a 'massive skull fracture extending to the base of the skull and also all the way across [the] top of the head on to the right side.' These fractures radiated from a 3/4 inch ovoid fracture area on the back of the skull which was the point of impact. She had a subdural hematoma, massive brain swelling and brain bruises. … [¶] The autopsy also showed Shaena had a bruise on her forehead, five circular bruises along the left angle of her jaw and another bruise toward her chin, a small bruise on the left side of her lower chest, one

5

on the left forearm, one on the buttock and one on the right shin. The bruises were compatible with the period just before Shaena came into the hospital and were not much older than that. Shaena's jaw bruises were consistent with fingertip marks. It was unlikely these bruises would have been caused during the medical procedures because Shaena had been comatose and there would have been no need to exert the kind of force that would have been required to cause the bruises in order to restrain her movement during the procedures.

"The deputy medical examiner who conducted the autopsy testified the degree of injury was, in his experience, 'seen in circumstances like a major automobile accident with head impact, a fall from a significant height, or a blow to the head or blows to the head with hard objects' or 'this could be a push of the head against a hard object.' The injury was also consistent with being pushed up against a wall or swung against a wall or other hard object. He did not believe the injury was consistent with falling out of a bed onto a carpeted floor.

"Dr. David Chadwick, a pediatrician and the director for the Center for Child Protection at Children's Hospital who examined Shaena on May 15, testified her injury was non-accidental. He based his opinion on the type of injury, the amount of damage and his knowledge of accidents and forces required to produce that amount of injury. The bruises along Shaena's jawline, which were consistent with fingertip marks, increased his certainty the injury was non-accidental. He stated his level of certainty was 'very high. We are talking 1000 to 1 … .' He believed it was likely 'she was set into motion by somebody, that she was swung so her head was moving rapidly, and she struck

6

a firm surface with her head.' He believed it was not possible for her to fall in a house with an eight-foot ceiling to produce that kind of injury."

At trial, Busch presented an expert witness who testified Shaena's injury could have occurred approximately 15 hours before she was admitted to the hospital and her cold symptoms could have been indicative of a subdural hematoma. He "theorized Shaena, in essence, did a reverse swan dive from her bed to the floor the night before she was brought to the hospital, was unconscious when found [on the floor by another individual living in the home] but was able to regain consciousness the next day. He theorized she continued to bleed from the injury throughout the day until she was taken to the hospital. He testified Shaena's napping, lack of appetite and vomiting were all consistent with having a head injury. [The defense expert's] theory was based, in part, on a belief that the blood that had accumulated in Shaena's brain at the time she was taken to the hospital was about 150 [cubic centimeters (cc)]. [The defense expert] testified it would take hours to develop this volume. Busch concedes the actual amount of bleeding was much less, between 45 to 60 cc's. There was testimony this volume of blood would take an hour or less to accumulate."

"The People's experts also testified Shaena's deterioration would have been swift after her injury, involving only minutes or a few hours. They agreed bleeding in the brain could occur over an extended period of time (a 'chronic hematoma') but that in this case, with the relatively small amount of blood that was seen, the lack of clotting and the extent of brain swelling, the injury probably occurred within an hour of hospitalization. There was also testimony that given the severity of Shaena's injury she would not have

7

been up and walking around, playing and laughing; she would have been in 'severe pain' and become 'comatose, or … extraordinarily disabled.' "

*Accounts of Prior Injuries*

We described witness accounts of prior injuries in the direct appeal:  "In early January 1988 or late December 1987, Shaena's babysitter, the babysitter's husband and a woman who used the same babysitter noticed marks on Shaena's face that looked like a handprint or slap.

"In April, Shaena's babysitters and other people noticed Shaena had a black eye. [Shaena's mother] and Busch gave a number of different stories to explain how Shaena got the black eye.  A number of these stories involved Shaena playing around a foosball table.  Other stories involved Shaena being hurt by a door knob.

"Shaena's babysitters also testified Shaena did not want to leave with Busch when he came to pick her up.  Instead, Shaena would cling to the babysitter.  Once another woman who used the same babysitter had to carry Shaena out to Busch's car.  In contrast, when [Shaena's mother] arrived to pick up Shaena, Shaena would run to her."[4]

---

[4]    In the direct appeal, we concluded the court erred in admitting the evidence of prior injuries because the probative value of the evidence was outweighed by the potential for prejudice.  However, we concluded the error did not require reversal because the evidence had only slight probative value for the issue of whether Shaena's death was accidental and the court instructed the jury not to use the evidence for concluding Busch had a bad character or disposition.  As to the fear evidence, we noted it was admitted to corroborate the babysitter's testimony Busch contacted her because he was concerned about what she would tell authorities, which tended to show consciousness of guilt. Assuming, without deciding, it was error to admit the fear evidence, we concluded it did not require reversal because it was not reasonably probable the conviction rested on the evidence of fear because "[t]here was overwhelming evidence establishing that Shaena's

*Busch's Version of Events*

At the parole hearing, Busch's attorney stated Busch was maintaining his innocence and would decline to discuss the life crime. However, Busch clarified he was willing to discuss the events of the day. He also gave an account to a psychological evaluator.

Busch stated the children were playing while he was working on a correspondence course with his friend. He said the children were "running in and out, rambunctious as kids will be." He heard his son and Shaena fighting in the living room. When he went to look, Shaena was sitting on his son's head and he was crying. He stated he sent Shaena to her room, but she did not go into her room. When he went down the hall to see why, their friend's son was in the room playing and it was a mess. Busch said he told Shaena to go to his room and she vomited. "She looked at me and threw up. I cleaned her up and put her in our bed. And I checked on her periodically, until I finally checked on her the time that I found her on the floor, which was why I theorized she had fallen out of the bed." Busch stated he did not act right that day and he should have rushed Shaena to the hospital without delaying to call her mother first. He stated, "I wish I had acted better, but I panicked."

---

fatal injury was inflicted sometime between 3 to 4 p.m. and that Busch was the cause of the injury." We did not decide the evidence was not reliable or had no relevance for purposes of considering suitability for parole. (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

Busch stated Shaena was exhibiting signs of a cold on the day of the incident and complained of a headache, by "pointing to her head and saying 'hur, hur,' not pronouncing the 'T' in 'hurt.' " He also stated she was not eating well that day.[5]

Busch told the Board "there was conflicting medical opinion on the cause of Shaena's injury or possible causes, and the time frame between when she was injured and when she finally succumbed to that injury. Some of the—one of the doctors theorized that her injury had actually been caused days before, and it took a while for the pressure on the brain to cause her to pass out. Other doctors thought that the unconsciousness would have been instantaneous."

Busch said he believed Shaena "was already injured and we just didn't recognize the symptoms. And according to [the defense expert] who testified at my trial, the blood from the injury was pooling on her brain, and that's what was causing her to exhibit flu or cold-like symptoms and to be listless. And as the day progressed, things just got worse with her." He denied knowing how the injury occurred.

---

[5] We noted in the direct appeal Shaena's mother testified at trial Shaena rubbed her head on the morning of the incident and said "hurt, Mama, hurt." However, Shaena's mother did not mention Shaena complaining of her head hurting during the mother's two interviews with law enforcement after the incident. Although Shaena's mother initially believed Busch was innocent and planned a pregnancy with him believing he would be acquitted, she changed her mind and broke off communications with Busch shortly after he was convicted and the new baby was born.

*Pre-Conviction History, Post-Conviction History, and Parole Plans*

Busch was 51 at the time of the 2014 parole hearing. He was raised in a two-parent home with three siblings and described his family life as "idealic." He graduated from high school and nearly completed an Associate of Arts degree while in prison.

Busch served in the Marine Corps from 1980 to 1989 and obtained the rank of Staff Sergeant. He never received any discipline. He had no juvenile or arrest history prior to the commitment offense.

He was married when he was 19 years old and, after six years of marriage, his wife left him while he was stationed overseas. He had a son from his marriage who was living with him at the time of the commitment offense. He lived with Shaena's mother for a little over a year. The relationship ended after he was convicted. He has a daughter born to Shaena's mother after he was incarcerated. He has no contact with either child.

Bush denied any affiliation with a street or prison gang. He participated in numerous self-help groups, many of which he co-facilitated. He received laudatory chronos for volunteering his time and participating in various classes and programs. He received no forms of discipline while incarcerated.

His parole plans included living with another inmate's parents and working with a construction company. Alternatively, he was seeking housing at a transitional living facility, but did not yet have a letter of acceptance. The evaluator expressed concern about the viability of Busch's parole plan.

*Psychological Evaluations*

An assessment in 2000 noted Busch presented with "marked irritability, just below the surface." The evaluator noted if Busch was mischaracterizing his past and was responsible for Shaena's death, "there would be great cause for concern regarding recurring violence."

In a 2008 evaluation, Busch admitted to one instance of violence when he "punched out a car window" during a brief physical altercation following an argument with his wife. When he was asked about Shaena's facial bruises, he attributed them to the insertion of the intubation tube at the hospital. The evaluator noted Busch's responses to questions as "rather flat in quality and lacking in spontaneity." The evaluator questioned his honesty in denying responsibility for the crime.

The 2014 risk assessment included a provisional diagnosis of adult antisocial behavior based on his conviction of the life crime "suggesting impulsivity, irritability, aggressiveness, having a reckless disregard for the safety of others, and being [indifferent] to hurting or mistreating others." In assessing remorse and insight, the 2014 evaluator noted Busch "expressed his sadness regarding the victim dying, which appeared sincere, while adamantly denying having committed this crime. He asserted he thought there was probably something he could have done differently and that he was somehow negligent at the time."

When asked if there was anything he wished to emphasize to the Board, Busch told the evaluator, "Judge me for who I am now and not who I was then," which the evaluator thought was "a rather odd statement to make considering this inmate had no

12

prior criminal history, was in the military for 10 years with no disciplinary actions, and has programmed exceptionally well while in prison. He has never received a disciplinary infraction, has participated in numerous self-help groups, and co-facilitated, as well as having co-founded one of the groups." When asked to explain this comment, Busch stated he was misquoted and actually said "judge me for who I am now, not who I was accused of being then."

On the "Level of Service Case Management Inventory," Busch obtained a score "that was higher than .3% of the normative sample of incarcerated male offenders in the United States—meaning that .3% of inmates evidenced fewer risk factors associated with general recidivism." On the "Psychopathy Checklist," Busch's score was "higher than 16% of the normative sample … meaning that 16% of male offenders evidenced fewer traits of psychopathy and 84 % evidenced more."

However, the evaluator stated Busch's contention he did not cause the death of Sheana as convicted left "open the possibility that he is a pathological liar. If he is lying, it suggests that he is attempting to con or manipulate others so that he does not have to admit to himself or others that he committed this crime. His denial also suggests he is not remorseful or sorry for his crime. He stated he finds his sentence too severe and at one point said, if he had committed this crime, he thought he had already done enough time. Last, although, his presentation at the time of the interview was not particularly glib or grandiose, he impressed the undersigned evaluator as somewhat cold and unemotional."

In the clinical analysis, the evaluator noted "factors displayed predictive for recidivism include the possibility that he maintains a criminal attitude and that he is

13

lacking insight into himself, and into the commitment offense, although he has participated and co-facilitated numerous self-help groups.  [¶] To his credit, he has never received a disciplinary infraction while incarcerated."

Overall, the evaluator believed Busch represented a "low or non-elevated risk of violence."  However, the evaluator opined "assuming this inmate is guilty as convicted, his risk for future violence could increase if he found himself without a stable living situation, if he lacked income to support himself financially, if he abused intoxicating substances, or if he were to reside in the same residence as small children."  The evaluator noted, until he paroles, Busch "would likely benefit from continued self-help group participation, in addition[] to continued exploration into himself and into the crime of which [he] was convicted."

*Board's Decision*

The Board determined Busch was suitable for parole in July 2014.  The Board noted the murder itself of a vulnerable two-year-old victim was horrific.  The presiding commissioner also stated, "As far as your understanding, and past and present mental state, and past and present attitude about the crime, I have to tell you that at this point I do think … that there is a lack of insight and understanding, and a lack of credibility there.  I don't necessarily believe what you're telling us today about what happened.  I think the evidence suggests otherwise in the paperwork."

Nevertheless, the Board found Busch's exemplary performance in prison weighed in favor of suitability for parole because he had no rules violations, no violence, no drugs, no gang affiliation, and no mental health issues.  They noted he had no juvenile history

14

and no arrests or convictions before he came to prison. He also programmed well in many different areas. One of the commissioners described Busch as "the poster child for … the model inmate."

*Governor's Reversal*

In December 2014 the Governor reversed the Board's grant of parole. Although the Governor acknowledged Busch made efforts to improve himself while incarcerated and had never been disciplined, he determined these positive steps were outweighed by negative factors demonstrating Busch remains unsuitable for parole.

The Governor noted the crime was horrific. Busch "struck a helpless two year old with such force that she suffered a massive skull fracture and serious brain injuries which caused her death." The Governor also noted witnesses reported seeing bruises on Shaena's face in the months prior to her death.

The Governor also found Busch's claim of innocence based on his story he found her on the ground after putting her to bed and his claim her injuries were caused from a fall from a bed were "entirely implausible" and "impossible to believe." The Governor noted more than one doctor concluded the injuries resulting in her death could not have been caused by a fall out of bed. The Governor referred to evidence Shaena had five circular bruise marks on her jaw "consistent with the shape and size of fingertips, suggesting that her head had been grabbed." He also noted a doctor hired by the district attorney's office opined the most likely explanation for Shaena's head injury was "[a] hand was held forcefully over her mouth to keep her from making noise … [and] the back of her head was violently pushed against a hard surface one or more times." The

Governor also noted a troubling pattern of abuse based on observations Shaena had bruises and a black eye in the months prior to her injury and a babysitter told investigators Shaena was fearful and did not want to go with Busch.

The Governor concluded "Shaena's previous injuries and the doctors' conclusions that falling out of bed could not have caused Shaena's massive head injury indicate that Mr. Busch's claim of innocence is unbelievable. Mr. Busch is not required to admit guilt to be granted parole, but, under these circumstances, his claim that Shaena died because she fell out of bed is implausible. His story, to me, indicates he is not yet honestly addressing the underlying issues that led to the death of this child." Based on the evidence in the record, the Governor found Busch currently poses an unreasonable danger to society if released from prison.

The Superior Court of San Diego County denied Busch's petition for writ of habeas corpus finding the Governor's decision to reverse the Board was based on a modicum of evidence supporting a finding of current and future dangerousness. Busch thereafter filed a petition for writ of habeas corpus with this court. We issued an order to show cause to consider the issues raised in the petition.

DISCUSSION

I

*Guiding Legal Principles and Standard of Review*

"[T]he fundamental consideration in parole decisions is public safety." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1205 (*Lawrence*).) The decision whether to grant parole is an inherently subjective determination. (*In re Rosenkrantz* (2002) 29 Cal.4th

16

616, 655 (*Rosenkrantz*).) The Board and the Governor must consider "[a]ll relevant, reliable information available" (Cal. Code Regs., tit. 15, § 2402, subd. (b)) and the decision is guided by the factors identified in section 3041 and the Board's regulations. Among these factors are the nature of the commitment offense, including the inmate's behavior before, during, and after the crime, as well as the inmate's social history, mental state, criminal record, attitude towards the crime, and parole plans. (Cal. Code Regs., tit. 15, §§ 2281, subd. (b), 2402, subd. (b).)

The regulations identify circumstances tending to establish suitability and unsuitability for parole. (Cal. Code Regs., tit. 15, § 2402, subds. (c), (d).) However, these circumstances provide only general guidelines. The importance attached to any circumstance or combination of circumstances in a given case is left to the Board's or the Governor's sound judgment. (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 654.) "It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*Lawrence*, *supra*, 44 Cal.4th at p. 1212.) Consequently, a factor that might not by itself establish an inmate's unsuitability for parole may still contribute to a finding of unsuitability. (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

When the Board finds an inmate convicted of murder suitable for parole, the Governor may conduct an independent review of the entire record to determine whether the inmate currently poses a threat to public safety. (Cal. Const., art. V, § 8, subd. (b); § 3041.2; *In re Shaputis* (2011) 53 Cal.4th 192, 215, 220-221 (*Shaputis II*).) The

17

"Governor has discretion to be 'more stringent or cautious' in determining whether a defendant poses an unreasonable risk to public safety." (*Lawrence*, *supra*, 44 Cal.4th at p. 1204.)

Our power to review the Governor's decision is limited.  As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual inmate in accordance with applicable legal standards, our review is restricted to ascertaining whether there is some evidence in the record to support the Governor's decision the inmate poses a current threat to public safety.  (*Lawrence*, *supra*, 44 Cal.4th at p. 1212; *Rosenkrantz*, *supra*, 29 Cal.4th at p. 677.)

The " 'some evidence' standard is *more deferential* than substantial evidence review, and may be satisfied by a lesser evidentiary showing." (*Shaputis II*, *supra*, 53 Cal.4th at p. 210.)  "Some evidence" in this context means only a modicum of evidence. " 'Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of [the Board or] the Governor.  … [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of [the Board or] the Governor. … As long as the … decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the … decision.' " (*Ibid*.)

We are not permitted to reweigh the evidence.  " 'It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole.' " (*In re Shaputis* (2008) 44

18

Cal.4th 1241, 1260 (*Shaputis I*).) "Only when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor. In that circumstance the denial of parole is arbitrary and capricious, and amounts to a denial of due process." (*Shaputis II*, *supra*, 53 Cal.4th at p. 211.)

## II

### *The Governor's Decision is Supported by Some Evidence*

The Governor considered the record and concluded Busch is unsuitable for parole because he remains a danger to society if released from prison. The Governor based his decision on the horrific nature of the crime, the implausibility of Busch's account of how Shaena received her massive head injuries, and the fact Busch has not honestly addressed the issues underlying the death of the child.

### A

The circumstances of the commitment offense are an appropriate consideration in determining parole suitability. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).) The circumstances of the crime provide some evidence of current dangerousness to the public if "the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*Lawrence*, *supra*, 44 Cal.4th at p. 1214.) Among the signs of an especially heinous commitment offense are: "[t]he victim was abused, defiled or

19

mutilated during or after the offense"; "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering"; and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(C)-(E).)

Each of these signs is present in this case. Two-year-old Shaena was struck or pushed with such force against a hard surface that she suffered massive skull fractures causing her brain to swell, ultimately resulting in her death. The bruises on her face indicate a hand grabbed her face or was held forcefully over her mouth, perhaps to keep her quiet, while her head was violently pushed against a hard surface. The evidence showed these injuries could only have been incurred by horrific abuse carried out with callous disregard for Shaena's suffering. The record suggests Busch may have been frustrated due to the disruptive behavior of the children while he was studying, which is certainly trivial in relation to the nature of abuse inflicted on Shaena. There is more than a modicum of evidence supporting the Governor's characterization of the crime as horrific.

B

In addition to the horrific nature of the crime, the Governor determined Busch's implausible explanation that Shaena's injuries resulted from a fall out of bed "indicates that he is not yet honestly addressing the underlying issues that led to the death of this child." An inmate's acceptance of responsibility and development of insight are also appropriate considerations in determining parole suitability. (Cal. Code Regs., tit. 15, § 2402, subd. (d)(3); *Shaputis I*, *supra*, 44 Cal.4th at p. 1246.) "[T]he presence or

20

absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety." (*Shaputis II*, *supra*, 53 Cal.4th at p. 218.)

Busch has asserted Shaena's injuries could have resulted from an injury either earlier in the day or the day before while she was under the care of either a babysitter or her mother, or from a fall from bed the night before. He relied on the testimony of a defense expert who stated Shaena's signs of a cold were consistent with an existing head injury and could have resulted from a "reverse swan dive" fall out of bed.

However, this expert's testimony was based upon the premise that Shaena would have continued to bleed throughout the day and she would have accumulated a large volume of blood (150 ccs) in her brain by the time she was taken to the hospital. This testimony was severely undermined by Busch's concession her actual bleeding was much less (between 45 and 60 ccs), and this amount of blood would have accumulated in an hour or less. There was evidence Shaena could not have been playing and laughing in the hours before the incident if she had already suffered massive head injuries. Instead, she would have been in severe pain and either comatose or extraordinarily disabled.

In addition, a number of physicians testified the extensive injuries Shaena suffered could not have occurred as a result of a fall from a bed. Shaena would have had to fall from a significant height, 20 feet or more, to sustain the extent of injuries she suffered.

The fact Busch continues to cling to the entirely implausible theory the injury was caused by a fall from a bed either the night before or earlier in the day supports the Governor's conclusion Busch lacks insight into the crime and has not honestly addressed

21

the underlying issues leading to Shaena's death. The Governor also pointed to the troubling pattern of abuse Shaena suffered in the months leading up to her death, which included bruises on her face and a black eye. The psychologist who evaluated Busch noted his contention he did not cause Shaena's death leaves open the possibility he is a pathological liar and he is not remorseful. He told the evaluator even if he had committed the crime, he has already done enough time. The evaluator expressed concern regarding a risk of future violence if he were to reside again with small children. The evaluator also indicated he would benefit from additional exploration of himself and the crime.

The record as a whole establishes more than a modicum of evidence to support the Governor's conclusion Busch is currently dangerous because he lacks insight into the crime. There is a rational nexus between the evidence and the Governor's determination of current dangerousness. (*Shaputis II*, *supra*, 53 Cal.4th at p. 221; *In re Criscione* (2009) 180 Cal.App.4th 1446, 1461 [pro forma recitation of nexus by parole authority is not necessary, merely an articulation of reasoning].)

C

Busch contends the Governor's reason for denying him parole amounts to an unlawful insistence he admit guilt. We disagree.

"The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." (§ 5011, subd. (b).) However, when, as here, an inmate goes beyond a simple denial of guilt and chooses to provide a version of events, neither section 5011, subdivision (b), nor title 15, section

22

2236 of the California Code of Regulations preclude the Governor from considering the plausibility of the inmate's version of events to the extent it bears on the inmate's parole suitability. To the contrary, the parole authority is required to consider "[a]ll relevant, reliable information available" when determining an inmate's parole suitability. (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

An inmate with a plausible account, who has accepted responsibility for his or her professed actions, expressed remorse, effectively participated in rehabilitative programs, and been found by a psychologist to present a low recidivism risk may be suitable for parole notwithstanding the inmate's claim of innocence or reduced culpability. (See, e.g., *In re Pugh* (2012) 205 Cal.App.4th 260, 269; *In re Jackson* (2011) 193 Cal.App.4th 1376, 1389-1391; *In re Palermo* (2009) 171 Cal.App.4th 1096, 1110-1112, disapproved on another ground in *In re Prather* (2010) 50 Cal.4th 238, 252–253.) Conversely, an inmate with an implausible account, but an otherwise exemplary prison record, may be unsuitable for parole if the implausibility of the inmate's account indicates the inmate does not appreciate the magnitude of the commitment offense or its contributing causes and there is psychological evidence the inmate's character has not appreciably changed since the commitment offense. (See, e.g., *Shaputis I*, *supra*, 44 Cal.4th at p. 1260; *In re McClendon* (2003) 113 Cal.App.4th 315, 321-322.)

As one appellate court explained, "where the inmate's version of events is contrary to the facts established at trial and is inherently improbable, this reflects on the inmate's credibility, and indicates a refusal to admit the truth to himself and to others. This establishes a nexus to current dangerousness because it indicates the inmate is hiding the

23

truth and has not been rehabilitated sufficiently to be safe in society." (*In re Pugh*, *supra*, 205 Cal.App.4th at p. 273.) The Supreme Court explained "an *implausible* denial of guilt may support a finding of current dangerousness, without in any sense requiring the inmate to admit guilt as a condition of parole. In such a case it is not the failure to admit guilt that reflects a lack of insight, but the fact that the denial is factually unsupported or otherwise lacking in credibility." (*Shaputis II*, *supra*, 53 Cal.4th at p. 216.)

Some courts have suggested the Board or the Governor must accept an account "that is ' "not physically impossible and [does] not strain credulity." ' [Citations.] [¶] … [H]owever, … this view 'has been called into question' by the Supreme Court's decision in *Shaputis II*. [Citation.] In *Shaputis II*, the high court held not only that 'an *implausible* denial of guilt may support a finding of current dangerousness …' [citation], but that credibility and therefore plausibility is for the Board [or the Governor] to determine. Thus, when 'the parole authority declines to give credence to certain evidence, a reviewing court may not interfere unless that determination lacks any rational basis and is merely arbitrary.' " (*In re Sanchez* (2012) 209 Cal.App.4th 962, 974 quoting *Shaputis II*, *supra*, 53 Cal.4th at p. 216.)

In this case, Busch did not simply deny guilt. He provided a version of events and a theory of injury that, as discussed above, is entirely implausible based upon the evidence. The facts of this case are not similar to *In re Swanigan* (2015) 240 Cal.App.4th 1, 19 in which the inmate's denial of guilt was not inconsistent with the evidence at trial because the assailant's face was covered and the eyewitness accounts were unreliable. Both the Board and the Governor found Busch's version of events incredible and entirely

24

inconsistent with the evidence. These determinations were not arbitrary and did not violate section 5011, subdivision (b).

III

*Busch's Sentence is not Constitutionally Disproportionate to his Culpability*

A prisoner cannot be held for a period of time grossly disproportionate to his or her individual culpability for the commitment offense, even if sentenced to a life-maximum term because such a term violates the cruel or unusual punishment clause (art. I, § 17) of the California Constitution. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1096.) However, the parole authority is not required "to set premature release dates for current life-maximum prisoners who, it believes, present public safety risks." (*Id*. at p. 1098.)

Busch contends his life sentence has become constitutionally disproportionate to his culpability. We do not believe Busch has met his burden to establish such a claim. (*People v. Duvall* (1995) 9 Cal.4th 464, 474.) Busch was 25 years old when he killed an innocent two-year-old child with her whole life before her. He inflicted such significant head injuries as to cause her skull to crack and her brain to swell to such an extent her vital organs no longer functioned. We cannot say the 26 years he has served for this offense has become constitutionally disproportionate to his culpability. (*People v. Lewis* (2004) 120 Cal.App.4th 837, 856.)

25

DISPOSITION

Petition denied.

McCONNELL, P. J.

WE CONCUR:

BENKE, J.

O'ROURKE, J.